# REAL ESTATE VALUATION IN LITIGATION

SECOND EDITION



J.D. Eaton, MAI, SRA

APPRAISAL INSTITUTE

CHAPTER 10

# Sales Comparison Approach to Value

The sales comparison approach is

> A set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison and making adjustments to the sale prices of the comparables based on the elements of comparison.[1]

Once referred to as the *market data approach*, this approach to value has more fully been defined as:

> [T]raditionally, an appraisal procedure in which the market value estimate is predicated upon prices paid in actual market transactions and current listings, the former fixing the lower limit of value in a static or advancing market (price wise), and fixing the higher limit of value in a declining market; and the latter fixing the higher limit in any market. It is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised. The reliability of this technique is dependent upon (a) the availability of comparable sales data, (b) the verification of the sales data, (c) the degree of comparability or extent of adjustment necessary for time differences, and (d) the absence of non-typical conditions affecting the sales price.[2]

Over the years, the term *market data approach* was criticized as misleading because all approaches to value require the use of market data. "Estimates of market rent, cost, depreciation, and other value parameters may be derived in the other

1. *The Dictionary of Real Estate Appraisal*, 3d ed. (Chicago: Appraisal Institute, 1993), 318.
2. American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers, *Real Estate Appraisal Terminology*, rev. ed., Byrl N. Boyce, ed. (Cambridge, Mass.: Ballinger Publishing Company, 1981), 160.

approaches to value using [market data] comparative techniques."[3] The approach is now referred to as the *sales comparison approach* in the real estate appraisal community. Hopefully, this change in terminology will help the courts recognize that, like the sales comparison approach, the income capitalization and cost approaches are based on market data and result in indications of *market value*.

The courts appear to prefer the sales comparison approach to value overwhelmingly. "Ordinarily, if there are sales of comparable property at or near the time the condemned property is taken, evidence in regard to such sales would be more appropriate than any other method in determining the market value of the property taken."[4] In a few jurisdictions, this preference has caused courts to exclude any other approach to value when comparable sales are available. One court stated, "[t]o be consistent with our many decisions holding the omission of evidence as to capitalization of revenue or cost of reproduction to be proper because of the nonavailability of evidence of comparable sales of similar lands, we hold the availability of evidence of comparable sales of similar lands operates to exclude from evidence testimony as to other methods for determining the fair market value."[5]

Comments by condemnors support the courts' preference for the sales comparison approach. "Arm's length transactions in lands in the vicinity of and comparable to the land under appraisement, reasonably near the time of taking, are the best evidence of market value."[6] "The most reliable evidence of the value of the site is recent sales of similar sites."[7] "The comparative method of presenting market value evidence is the method most acceptable to WSDOT [Washington State Department of Transportation] and to the courts and juries; consequently, the greatest reliance is usually placed upon market comparison."[8] "The sales comparison approach should be developed and relied upon whenever there is adequate market data."[9]

## ADMISSIBILITY OF COMPARABLE SALES DATA

Evidence of comparable sales has been admitted in nearly all jurisdictions, but the reasons for admitting such evidence vary.

> Evidence of sales of comparable property may be offered under three conditions: (I) on direct examination of expert or lay witnesses as independent substantive evidence of the value of the property to which the comparison relates, or (II) on direct examination of the value-witness to give an account of the factual basis upon which he founds his opinion on the issue of value of the real estate in controversy, or (III) on cross-examination of the value-witness to test his knowledge, experience and investigation and thus affect the weight to be given to his opinions.[10]

3. *The Appraisal of Real Estate*, 10th ed. (Chicago: Appraisal Institute, 1992), 367.
4. *United States v. 100 Acres in Marin County*, 468 F.2d 1261, 1265 (9th Cir. 1972) *cert denied*, 414 U.S. 822 (1973); see also *United States v. 24.48 Acres*, 812 F.2d 216 (5th Cir. 1987).
5. *Lataille v. Housing Authority of City of Woonsocket*, 280 A.2d 98, 100 (R.I. 1971).
6. *Uniform Appraisal Standards for Federal Land Acquisitions* (Washington, D.C.: U.S. Government Printing Office, 1992), §A-4, p. 11.
7. Washington State Dept. of Transportation, *Right of Way Manual*, Chapter 4, Appendix 4-1, Tab C, Item 4A, p. C-11 (revised August 1991).
8. Ibid., Item 4B, p. C-12.
9. U.S. Department of Transportation, Federal Highway Administration, *The Appraisal Guide* (Washington, D.C.: U.S. Government Printing Office, 1990), 43.
10. *Hays v. State*, 342 S.W.2d 167, 170-171 (Tex. 1960).

The minority position is that sales may only be admitted on cross-examination. The reasoning for the exclusion of sales data on direct examination is twofold. First, it has been argued that the admission of such testimony opens up too many collateral issues and "...proves nothing. It is therefore irrelevant, improper, and dangerous."[11] Second, testimony by an appraiser in reference to the price, terms, and conditions surrounding a sale is hearsay evidence because the witness was not a party to the transaction and was not present at the time of the closing.[12] Despite these arguments, the trend is to allow direct evidence of comparable sales on direct examination.[13] "Actual experience in the trial of land damage cases in states in which evidence of this character is admitted does not show the objections mentioned above to be as formidable as supposed. If the admission of such evidence is regulated with reasonable judgment by the presiding justice, it throws light upon the issue before the jury as nothing else can."[14] Some jurisdictions have, in fact, enacted legislative exception to the hearsay rule so as to allow evidence of comparable sales on direct examination.[15]

An exception to the hearsay rule is allowed in federal courts under the Federal Rules of Evidence, which allow an expert to testify to the factors upon which his opinion is based, as long as the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[16]

It is probably of little concern to the appraiser whether the sale price of a comparable is admitted as direct evidence of the value of the property being appraised or as support for the appraiser's opinion of market value. It may be significant, however, insofar as a sale presented as direct evidence of the market value of the property under appraisal must generally have a higher degree of comparability than a sale submitted as support for the appraiser's opinion of market value. In fact, a court will often rule on the comparability of a sale, as a matter of law, before the appraiser is allowed to testify to the price of the comparable.[17]

Most jurisdictions allow the price of comparable land to be admitted as direct, or independent, evidence of the market value of the property in dispute.[18] Under such circumstances, the rule of admissibility is an exception to the hearsay and best evidence rules.[19] The reasoning behind this exclusion from the rules is well stated in a Montana case:

> All expert opinion is based on "hearsay" to a great extent and much of what is presented by such witnesses is "secondary" evidence. We feel we can achieve speedy litigation and still preserve the truth by the rule adopted here. It must be shown that the witness is expert and that the sales are comparable and recent. With these safeguards plus the fact that the witness has his professional reputation riding on his testimony we feel that the repugnancy of this line of testimony is reduced, if

11. *East Pennsylvania R. Co. v. Hiester*, 40 Pa. 53 (Pa. 1861). Comparable sales are now admissible on direct examination in Pennsylvania under Act of June 22, 1964, P.L. 84 §705(2)(i).
12. *National Bank of Commerce v. City of New Bedford*, 56 N.E. 288 (Mass. 1900).
13. *Pipeline v. O'Brian*, 418 F.2d 15 (5th Cir. 1969); *State v. Johnson*, 191 S.E.2d 641 (N.C. 1972).
14. *Nichols' The Law of Eminent Domain*, rev. 3d ed. (New York: Mathew Bender Co., Inc., 1991), vol. 5, §21.3[1].
15. Colorado, §38-1-118, C.R.S., 1973; New York, see *Lawrence v. Greenwood*, 90 N.E.2d 53 (N.Y. 1949) for statutory citings; Pennsylvania, Public Law 84 (1964) (Eminent Domain Code), §705(2)(i); California Evidence Code, §816.
16. Federal Rule of Evidence 703.
17. *People v. Murata*, 326 P.2d 947 (Cal. 1958).
18. *Jones v. United States*, 258 U.S. 40 (1922).
19. *United States v. 18.46 Acres of Land*, 312 F.2d 287 (2d Cir. 1963).

not eliminated altogether. The development of a value pattern by one experienced in the business and knowledgeable as to the area involved will best bring uniformity to the market value determination in the most efficient manner.[20]

In discussing the expert's reliance on hearsay evidence, it has been said that "[t]he physician makes life-and-death decisions in reliance upon [hearsay evidence]. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes."[21]

When a comparable sale is admitted only in support of the appraiser's opinion, it generally does not have to possess the same high degree of comparability as does the sale submitted as direct evidence of value. In such a case, "there is less reason for being strict in regard to similarity, because the evidence serves the purpose only of supporting the credibility of the estimate of value given by the witness."[22] When such support testimony is given, it is not usually necessary for the court to rule on its comparability before admitting the sale price of the comparable property. The price is not admitted as direct evidence of value but, rather, to assist the jury in measuring the reliability of the expert's ultimate opinion of value.[23]

## SALE OF SUBJECT

"Since compensation is measured by market value, prior sales of the same property, reasonably recent and not forced, are extremely probative evidence of market value. Accordingly, the appraiser has an obligation to determine what the owner paid for the property."[24] It is for this reason that appraisers are required to consider and report recent sales of the property under appraisal. Federal standards require the following:

**Sales history.** Include a ten-year record of all sales and, if possible, offers to buy or sell, the property under appraisal. If no sale of the property has occurred in the past ten years, include a report of the last sale.

Information to be reported shall include, name of the seller, name of the buyer, date of sale, price, terms and conditions of sale, and the appraiser's opinion as to whether the sale price represented market value at the time, and, if not, the reasons for the appraiser's conclusion.[25]

According to the Uniform Standards of Professional Appraisal Practice,

In developing a real property appraisal, an appraiser must:

(a) consider and analyze any current Agreement of Sale, option, or listing of the property being appraised, if such information is available to the appraiser in the normal course of business;

(b) consider and analyze any prior sales of the property being appraised that occurred within the following time periods:

---

20. *State v. Greenfield*, 399 P.2d 989, 992 (Mont. 1964).

21. Federal Rule of Evidence 703, "Notes of Advisory Committee on 1972 Proposed Rules."

22. *West Kentucky Coal Co. v. Commonwealth*, 368 S.W.2d 738, 741 (Ky. 1963).

23. *Bowers v. Fulton County*, 176 S.E.2d 219 (Ga. 1970).

24. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-5, p. 16.

25. Ibid., §B-1 – 13e, p. 71.

(i) one year for one-to-four family residential property; and

(ii) three years for all other property types.[26]

The Federal Highway Administration's appraisal guide states,

> Short form appraisal must contain...[t]itle information, including a five year sales history of the subject property.

and

> Minimum requirements for a detailed appraisal are set forth in 49 CFR [Code of Federal Regulations] Part 24 and include...title information, including 5-year sales history.[27]

A historical sale of the property in dispute is universally admitted as direct evidence of the value of the property as long as the sale was recent and voluntary, there were no changes in the property's condition, and no material fluctuations have occurred in the property's value since the date of sale.[28] No rule has been set down as to what constitutes *recent*; whether the sale of a property is recent enough to allow it into evidence is generally within the discretion of the court.[29]

For instance, a federal district court excluded from evidence a sale that occurred two years prior to the date of valuation for being too remote in time,[30] but in another case the federal court of appeals approved the admission into evidence of the purchase price of the property in dispute, although the sale occurred 14 years prior to the date of valuation.[31] A Michigan court ruled that "[a] nine year interval between the purchase of the land and its condemnation does not render the purchase price patently inadmissible."[32] Of course, evidence explaining the circumstances of such a sale may be admitted, and it has been held that consideration must be given to any appreciation between the date of sale and the date of condemnation.[33] Therefore, the appraiser must make an adjustment for the date of sale if it is warranted.

The rules regarding the admission of a prior sale of the property in dispute were laid down by the North Carolina court as follows:

> In general, purchase price is admissible if it is relevant to the value of the land at the time of condemnation. This rule was stated by this Court in *Board of Transportation v. Revis*, 40 N.C.App. 182, 252 S.E.2d 262, *review denied*, 297 N.C. 452, 256 S.E.2d 805 (1979).
>
> We review the established rules in North Carolina governing the competency and admissibility of evidence of purchase price paid by a condemnee for land later appropriated for public use, in a proceeding to establish just compensation for the taking:
>
> (1) It is competent as evidence of market value to show the price at which the property was bought if the sale was voluntary and not too remote in point of time.

26. The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* (USPAP), 1994 ed., Standards Rule 1-5, p. 13.

27. *The Appraisal Guide*, 29, 37.

28. *Commonwealth of Kentucky, Dept. of Highways v. Whitledge*, 406 S.W.2d 833 (Ky. 1966).

29. *Lembo v. Town of Farmingham*, 115 N.E.2d 370 (Mass. 1953).

30. *United States v. 765.56 Acres of Land*, 174 F.Supp. 1 (E.D. N.Y. 1959).

31. *United States v. Becktold Co.*, 129 F.2d 473 (8th Cir. 1942).

32. *Petition of Michigan State Highway Comm. v. McGuire*, 185 N.W.2d 187, 188 (Mich. 1970).

33. *Virgin Islands Housing Authority v. 15.5521 Acres of Land*, 230 F.Supp. 845 (D. V.I. 1964).

(2) When land is taken by condemnation, evidence of its value within a reasonable time before the taking is competent on the question of its value at the time of the taking.

(3) Such evidence must relate to the value of the property sufficiently near the time of taking as to have a reasonable tendency to show its value at the time of its taking.

(4) The reasonableness of the time is dependent upon the nature of the property, its location, and the surrounding circumstances. Some of the circumstances to be considered are the changes, if any, which have occurred between the time of purchase by the condemnee and the time of the taking by the State, including physical changes in the property taken, changes in its availability for valuable uses, and changes in the vicinity of the property which might have affected its value.

(5) The fact that some changes have taken place does not *per se* render the evidence incompetent. If the changes have been so extensive that the purchase price does not reasonably point to, or furnish a fair criterion for determining value at the time of the taking, when purchase price is considered with other evidence affecting value, the evidence of purchase price should be excluded.

(6) The ultimate criterion is whether, under all the circumstances, the purchase price fairly points to the value of the property at the time of the taking.[34]

A number of courts have held that a prior sale price of the property being condemned is the best evidence of value. It is imperative, therefore, that the appraiser investigate and thoroughly analyze any fairly recent sale of the property being appraised. Although the appraiser may conclude that comparable sales more than two years old are too remote in time to be meaningful, this would not necessarily apply to an earlier sale of the property being appraised.

It is not sufficient simply to report a prior sale of the property in question; the sale must be analyzed to determine its relevancy. If the appraiser finds that the sale did not represent market value and was not an arms-length transaction, that conclusion and the reasoning behind it should also be reported. It is not enough to state, "Based upon my analysis of the sale of the subject property, which occurred six months ago, I am of the opinion that the sale did not represent market value." Why didn't it represent market value? If changes in the property since the date of sale—e.g., rezoning, improvement, destruction—render the prior sale meaningless as a reference to current value, these factors must be reported and explained. For example:

> Following each sale [of the property under appraisal], state an opinion on whether the sale can be considered as evidence of value. Any physical changes to the property made after each such sale are briefly described, such as additional construction remodeling, etc. Also indicate the probable effect of remodeling, etc., upon market value. If more than one sale has occurred, an explanation is given

34. *City of Winston-Salem v. Davis*, 296 S.E.2d 21, 23–24 (N.C. 1982).

> for any change in price which could not be equated to physical changes, such as: contract sales vs. cash sale, change in neighborhood development, changes in general economics, etc. If the sale can be considered as evidence of value, the sale information and the appraiser's analysis thereof are reported on a Market Data Form...and included in the report. If the sale cannot be considered as evidence of value, the appraiser inserts a brief narrative instead of a Market Data Form giving the details of the sale, any physical changes subsequent thereto and an explanation of why the sale cannot be considered as evidence of value.[35]

If it is determined that a prior sale of the property is, in fact, relevant to its current value, this sale should be analyzed like any other comparable sale. Often, but not always, the only adjustment needed is for the date of sale. It is extremely important to verify any sale of the subject property. If the appraiser cannot make a reliable verification of the sale of the property under appraisal, it may be necessary to ask legal counsel to help verify the sale, possibly through the discovery process.

The appraiser may justifiably conclude that the prior sale of the subject should be given greater weight in the final estimate of value due to the lack of adjustments required for physical differences. However, this is not necessarily true as a matter of law. The prior sale price of the property in question is only one of many factors to be considered in arriving at a final estimate of value. As stated by the federal court, "[w]e reject the conception that a prior sale or sales of condemned property must always, as a matter of law, be given more weight in condemnation proceedings than sales of comparable property. Recent sales of the very property condemned are entitled to considerable weight, but sales of similar property are entitled to weight also; and the relative importance of the two is dependent upon the facts in the particular condemnation proceedings."[36]

If the appraiser has made a *time increment* or *market conditions* study, applying the results of this study to the prior sale price of the property should serve to support the final value estimate of the property. If it does not, a clear explanation of the divergence must be included in the appraisal report.

Any question concerning the appreciation/depreciation rate posed during cross-examination must be answered with great care. Opposing counsel may try to apply the appraiser's casual reply regarding general property appreciation/depreciation rates to a prior sale of the property in dispute, which may undermine the appraiser's testimony and final estimate of value. A leading question should never be answered with a simple *yes* or *no*. For example, the examiner may ask, "Do you agree with the article in the local paper last week which stated that property values in this county have increased 15% over the last year?" The appraiser must first determine whether such an article did appear in the local paper and, if so, whether it was accurately represented by counsel's question. Then the appraiser must let it be known that appreciation (and depreciation) rates fluctuate, depending on a number of variables such as property location, property type, property size, price ranges, and available financing. Although 15% might be

35. Washington State Dept. of Transportation, *Right of Way Manual*, Chapter 4, Appendix 4-2, Appraisal Report Guide, Part IIC, Item 4, pp. 8-9 (revised 11/10/76).

36. *Hickey v. United States*, 208 F.2d 269, 273 (3rd Cir. 1953) *cert denied*, 347 U.S. 919 (1954).

an average rate of appreciation for a large geographical area, it would not necessarily be correct to apply this rate to a specific property.

## COMPARABLE SALES

An appraiser will generally investigate, analyze, and consider many sales before selecting those that are the most pertinent to valuation of the property being appraised. Because the appraiser is usually attempting to estimate market value and "[t]he best evidence of such value is like and comparable sales within a reasonable time preceding the condemnation,"[37] it is imperative that all relevant factors be considered in the selection process.

The comparables selected must be the best from an appraisal standpoint and, whenever possible, there should be no question as to their admissibility. If the appraiser feels that a comparable sale may be inadmissible, but it is absolutely necessary for the proper estimation and support of value, the sale may be included, but its questionable admissibility should be pointed out, either in the appraisal report or separately, depending on the discovery rules within the jurisdiction. (For further information on the items included in the appraisal report, see Chapter 19.)

The best comparable sales, from both an appraisal standpoint and legal standpoint, are those that are most similar. To the appraiser this means the properties requiring the fewest adjustments to equalize them to the property under appraisal. The courts recognize "...that 'similar' does not mean 'identical,' but means having a resemblance, and that property may be similar in the sense in which the word is here used though each possess various points of difference."[38] The degree of similarity varies from case to case, so neither appraisers nor the courts can arrive at a formula to test comparability or similarity. In one instance adjustments totaling 15% of the sale price may indicate that the property is, in fact, not a *comparable sale*, but in another instance a sale with total adjustments equaling 15% of the sale price might turn out to be the most comparable sale available.

Before a property can be considered a comparable, the appraiser must ensure that the sale was an *open market transaction*. In other words, did the sale occur under the conditions commensurate with market value? (See Chapter 2 for a discussion of market value.)

1. Did the sale convey unencumbered fee simple title or its equivalent?
2. Were both the buyer and seller typically motivated?
3. Were both parties well informed or well advised and each acting in what they considered their own best interests?
4. Was the property allowed exposure in the open market for a reasonable length of time?
5. Was payment made in cash or its equivalent?
6. Was financing, if any, on terms generally available in the community at the time of sale and typical for the property type in its locale?

---

37. *Onego Corporation v. United States*, 295 F.2d 461, 463 (10th Cir. 1961).

38. *City of Chicago v. Vaccaro*, 97 N.E.2d 766, 773 (Ill. 1951).

7. Did the price represent normal consideration for the property sold unaffected by special financing amounts and/or terms, services, fees, costs, or other credits incurred in the transaction?

If these questions can all be answered affirmatively, the sale probably meets the criteria for an arm's-length transaction. A negative answer to Question 1 does not necessarily eliminate the sale as a comparable, however. For instance, if a leased fee estate was conveyed, it may be possible to adjust the sale price of the property to reflect the impact of the leasehold interest held therein. An affirmative answer to Question 2 eliminates all *forced sales* and all sales in which the price paid was affected by a personal relationship between the parties. A positive answer to Question 5 will eliminate sales involving trades or exchanges for other real or personal property.

A negative answer to some of the questions listed above does not necessarily mean the sale was not an open market, arm's-length transaction. For example, a seller may have paid a portion of the purchaser's financing fees. If the fees actually paid by the seller can be determined, this amount may be used as the basis for an adjustment to the indicated sale price. If the sale was actually a contract sale, it may or may not be admissible as evidence, depending on the jurisdiction and the specific terms and conditions of the transaction.

To determine whether a contract sale is admissible within a specific jurisdiction, applicable case law must be carefully analyzed. A distinction must be made between a *contract of sale* (real estate contract) and a *contract to sell* (e.g., an earnest money contract). A contract to sell is sometimes referred to as a *sale contract*[39] and this can cause confusion. Case law is divided on the admissibility of installment sales. Most jurisdictions appear to allow their admissibility, taking the position that if the offered sale is a contract of sale, this fact affects the weight of the evidence, not its admissibility. As *Nichols'* has stated, "[i]f evidence were to be excluded of all sales every cent of which was not cash, the door would practically be closed as to the evidence of other sales."[40] The admission of evidence in regard to contracts to sell, such as earnest money contracts, has met with mixed reactions. As a general rule, unexercised options are not admissible.[41] Similarly, sales which involve the exchange of property are generally inadmissible.[42]

The appraiser should personally verify sales with either the buyer or seller. If neither is available, the verification of a participating broker or attorney who handled the transaction is generally satisfactory. Verification of a sale with the broker or attorney *and* the buyer or seller will usually produce the greatest amount of useful, reliable information.

Many real estate appraisers employ research assistants or associate appraisers, who do much of the field research required for an appraisal and, at times, verify sales. This practice may be perfectly adequate for an appraisal report, but it is unacceptable for trial purposes. "Verification must be by competent and reliable personnel, and if the property goes into condemnation the sale must be personally verified by the appraiser who will testify."[43] As a Colorado court put it:

39. *State v. Bowling*, 414 S.W.2d 551 (Mo. 1967).

40. *Nichols'*, vol. 5, §21.3[1] (1991).

41. *Phillips Petroleum Co. v. City of Omaha*, 106 N.W.2d 727 (Neb. 1960).

42. *Nichols'*, vol. 5, §21.3[1] (1991).

43. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A–4, p. 12.

> By this statute [¶38-1-118, C.R.S. 1973] a legislative exception to the hearsay rule was created, but it is limited in its application. The use in this statute of the terms "personally" and "communicated directly" do not mean by or through someone other than the witness.[44]

By statute, the New Jersey courts allow testimony as to comparable sale prices so long as the appraiser has verified the sales with the buyer, the seller, or the broker.[45] This provision has been expanded by New Jersey case law to include attorneys as well.[46]

The weight of authority holds that sales to a purchaser with the power of eminent domain are not admissible.[47] However, there have been exceptions to this rule.[48] It has been stated that "...the burden is upon the party who offers such evidence to establish as a preliminary fact that the purchase, concerning which evidence is offered, was made without compulsion, coercion or compromise."[49] If the appraiser is to use such a sale, he or she must verify it with all the parties involved and explain the results of such verification explicitly in the appraisal report and in testimony.

If the seller made the initial contact and offered the property to the purchaser, there is strong evidence of no unusual compulsion. Also, a historical review of the number of parcels acquired versus the number condemned by the purchaser over a period of time can give some insight into any possible undue compulsion to buy or sell. Sales to purchasers with the power of eminent domain do not necessarily demonstrate a pattern of being either above or below the market value of the property. "A company condemning land might be willing to give more than it was worth, and the owner of the land might be willing to take less than it is worth, that is, less than its market value, rather than have a lawsuit."[50] The procedure recommended for reliable verification of sales to the government is discussed later in this chapter in the section titled "Advanced Problems."

The appraisal profession recognizes that accurate adjustments can sometimes be made for atypical financing and conditions of sale.[51] Adjustments for these factors can be made within the adjustment process. For example, an FHA discount paid by a seller to obtain a purchaser's financing can generally be accurately quantified by proper sales verification. The discount can then be deducted from the gross sale price of the property to determine the effective price the seller actually received for the property. In the same way, an atypical contract of sale may be accurately converted to a cash equivalent price.

## COMPARABILITY

As is the case with sales to an entity with the power of eminent domain, "[t]he party offering the sales claimed to be comparable has the burden of proving, as a preliminary to the introduction of the prices involved in such sales, that they are

44. *Denver Urban Renewal Authority v. Hayutin*, 583 P.2d 296, 299 (Colo. 1978).
45. N.J.Stat. Ann. §2A:83-1.
46. *New Jersey Sports and Exposition Authority v. Caruddi*, 395 A.2d 895 (N.J. 1978).
47. *United States ex rel. T.V.A. v. Bailey*, 115 F.2d 433 (5th Cir. 1940).
48. *United States v. 10.48 Acres of Land*, 621 F.2d 338 (9th Cir. 1980).
49. *Hannan v. United States*, 131 F.2d 441, 442 (D.C. Cir. 1942).
50. *Youts v. Public Service Co.*, 17 S.W.2d 886, 887 (Ark. 1929).
51. *The Appraisal of Real Estate*, 10th ed., 376-381.

similar both in character and locality to the land being condemned."[52] "[N]o fixed or general rule has or could be laid down which governs the degree of similarity that must exist between the properties sold and that condemned to make evidence of the sale or sales admissible...."[53] However, it is universally recognized that to be valid, a comparable sale must have the same economic highest and best use as the property being appraised.

> Appraisers have a special responsibility to consider carefully the comparability of all data used in a valuation assignment. They must fully understand the concept of comparability and should avoid comparing properties with different highest and best uses....[54]

Various lists of the typical adjustments to be considered have been developed. For instance, *The Appraisal of Real Estate* lists nine basic elements of comparison.[55]

1. Real property rights conveyed
2. Financing terms
3. Conditions of sale
4. Market conditions
5. Location
6. Physical characteristics
7. Economic characteristics
8. Use
9. Non-realty components of value

The *Uniform Appraisal Standards for Federal Land Acquisitions* lists the following factors of adjustment:[56]

- Property rights conveyed
- Financing terms
- Conditions of sale
- Market conditions (also know as "time of sale")
- Location
- Physical characteristics

These two lists are not substantially different. Economic characteristics, Item 7 in the first list, are considered in the second list under property rights conveyed and physical characteristics. Sales that have a different highest and best use are generally not considered comparable for eminent domain valuation purposes, and thus are rejected. The same is true of sales that include non-realty items in the sale price.

The date of sale (i.e., market conditions) of a comparable property is most important in a rapidly changing market.[57] At times an appraiser may be allowed to testify in regard to sales used in a time increment or market condition study to

---

52. *Dep't. of Public Works & Buildings v. Exchange Nat. Bank*, 356 N.E.2d 376, 383 (Ill. 1976).
53. *City of Evanston v. Piotrowicz*, 170 N.E.2d 569, 575 (Ill. 1960).
54. *The Appraisal of Real Estate*, 10th ed., 153.
55. Ibid., 373.
56. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-4, pp. 11-12.
57. *City of St. Louis v. Vasquez*, 341 S.W.2d 839 (Mo. 1960).

support an adjustment for this factor, even though the sale properties used in the study are not *comparable*.[58] Whether or not the specific data used in such a study are admissible, a time increment study should be undertaken by the appraiser, even if the appraiser makes no time, or market conditions, adjustments. Although the appraiser may not be able to testify to the specifics of the study, he or she will generally be allowed to testify that the time adjustment, or lack of an adjustment, was based on such a study.

Sales occurring after the date of taking have met with mixed reactions. The use of these sales falls under what is often termed the *hindsight rule*. It has long been argued that sales transacted subsequent to the date of taking should not be submitted as evidence, or considered by the appraiser, for two reasons. First, such sales represent information that would not have been available to the hypothetical purchaser on the date of taking; thus the appraiser would be considering market factors unknown as of the date of value. Second, subsequent sales may reflect *project enhancement*, which the appraiser must generally disregard in estimating the value of a property at the time of taking.

"Sales after the date of taking are not inadmissible *per se* (contrary to popular belief) and with appropriate caution and restraint may be utilized by the appraiser if they meet the usual standards of comparability and are not otherwise incompetent as evidence of value."[59] As a general rule "[s]ales occurring after the date of taking can be used to show the value of the subject property in the 'before' situation. It is also the general rule that comparable sales which reflect an enhanced value brought about by the making of the improvement are not admissible."[60] Sales occurring subsequent to the date of taking have generally met with greater acceptance when used to estimate a property's after value in a partial taking case rather than to value the property in the before situation. Such sales will often demonstrate damages or special benefits accruing to a remainder parcel.

Both appraisers and attorneys must be aware of the applicable law in the jurisdiction regarding the admissibility of sales subsequent to the date of taking. This information is essential even if the appraiser does not anticipate using such sales because the appraisers testifying for the opposing party may. If the admissibility of such sales is not clear in the specific jurisdiction, the appraiser should have available alternative sales to which he or she can testify if sales subsequent to the date of taking are ruled inadmissible. "Sales transacted on or before the date of taking are the preferred basis for an appraisal and if there are adequate such sales available there is little justification for using post-taking sales."[61]

The degree of proximity required of any specific sale property will vary with the type of property being appraised and sales activity in the area. The courts have, on many occasions, recognized this fact. "[N]o general rules can be laid down as to the distance at which other land ceases to be similar enough in location to the land in question so that evidence as to its sale price is admissible to

---

58. *City of Los Angeles v. Retlaw Enterprises, Inc.*, 546 P.2d 1380 (Cal. 1976).

59. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-4, pp. 13-14, citing *United States v. 312.50 Acres, Prince William County, Va.*, 812 F.2d 156, 157 n.3 (4th Cir. 1987); *United States v. 320.0 Acres of Land, More or Less, Etc.*, 605 F.2d 762, 799-803 (5th Cir. 1979).

60. *City of Tucson v. Ruelas*, 508 P.2d 1174, 1176 (Ariz. 1973) [citations omitted].

61. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-4, p. 14.

prove the value of the latter land. The determination of this question depends upon the character of the land involved and the facts and circumstances of a particular case."[62]

If an appraisal involves a single-family dwelling located within a subdivision, it will probably not be necessary for the appraiser to look outside that subdivision for comparable sales. If, however, the property under appraisal is a commercial site on an interstate freeway, properties 100 miles away could be termed *comparable* insofar as comparables are not always found in the immediate vicinity of the property being appraised and the properties would very probably be competing for the same customers—interstate highway users.

The test of comparability in terms of location is not the physical distance between properties, but whether the properties are within *economic proximity*. As stated by a Texas court:

> The distance between the condemned property and the property involved in an alleged comparable sale is important in determining whether both are in the same economic use area.[63]

A property's unique physical features can also expand the geographical area from which comparable sales may be drawn.

> We also reject the condemnor's contention that the trial court erred in admitting into evidence sales of property located in the Old Creek area, 30 to 50 miles from the Bailey land. The county apparently claims that all four of these sales were "noncomparable" as a matter of law, because the lands involved in these sales were "too remote" from the property which was the subject of the eminent domain proceeding. The 30 to 50 miles distance alone, it is suggested, required the exclusion of this evidence....
>
> In the instant case defendants' appraisal witness explained that because of the rather distinctive terrain of the Bailey property there were few sales of "comparable property" within the immediate vicinity. He testified that he searched for sales of properties which were similar to the condemned property in "size, character, topography, suitability for recreational use, access to creeks and access to roads," and on that basis, chose the Old Creek sales which plaintiff now claims are too distant to be "comparable." Given the great variety of factors of "comparability" to be considered, and the relative scarcity of similar property in the immediate vicinity, we cannot find that the trial judge abused his discretion in admitting the challenged sales....[64]

Nevertheless, the best rule of thumb for the appraiser is that, all else being equal, the best comparables are those located closest to the property being appraised. If the appraiser retained by one party in a dispute must go far afield to find truly comparable properties, it is likely that the appraiser retained by the opposing party will have to do the same. However, the appraiser must be cautious. One condemnor's attorney has been known to display an 8-ft.-by-10-ft.

---

62. *Chicago v. Harbecke*, 100 N.E.2d 616, 619 (Ill. 1951).
63. *Hays v. State*, 342 S.W.2d 167, 172 (Tex. 1960).
64. *County of San Luis Obispo v. Bailey*, 483 P.2d 27, 32–33 (Cal. 1971).

map of the United States in closing arguments to point out the location of the comparable sales used by the opposing party's appraiser.

A comparison of the physical characteristics of two properties can, of course, cover many items. The specific characteristics that require adjustment, or at least consideration, will vary with the type of property being appraised. An extensive list of the different physical characteristics of the properties can be developed, but the appraiser should only consider and include in the appraisal report those differences that are reflected in the marketplace. All such differences should be recorded in the appraiser's notes, whether or not an actual adjustment is called for, to help the appraiser testify competently on cross-examination.

Many appraisers have found that approximately one-third of the typical adjustments to a comparable sale applied in the appraisal of a single-family dwelling will represent 85% to 90% of the difference in value between the two properties. The mere existence of physical differences between two properties does not mean adjustments are required. An adjustment is necessary only if the difference is reflected in the price at which sellers are willing to sell and buyers are willing to buy.

In comparing the physical characteristics of properties, it is often desirable, and sometimes absolutely necessary, to apply a common unit of measure. The common units of measure for comparing vacant land are price per square foot, price per acre, price per front foot, price per whole site and in some instances price per developable (or typical) unit. This last unit of measure is often applied to land that has a highest and best use for multifamily dwellings. A common unit of measure for urban commercial sites is the allowable floor area ratio (FAR). The appraiser should use the unit of comparison that is common in the area and produces the most reliable range of values for the property being appraised. An appropriate unit of comparison generally establishes a much clearer pattern or trend of values than an inappropriate unit of comparison.

The units of comparison applied to improved properties are as varied as the number of uses to which property can be put. In appraising a unique or specialty property, the appraiser may spend as much time determining the common denominator as is spent performing the rest of the appraisal. Applicable units of comparison for typical property types are listed below.

| Property Type | Unit of Measurement |
|---|---|
| Single-family dwellings | Per sq. ft. or per room |
| Motels/hotels | Per room, gross income multiplier (*GIM*) |
| Apartments | Per sq. ft., per room, per unit, gross rent multiplier (*GRM*) |
| Retail | Per sq. ft. or per front foot |
| Warehouse | Per sq. ft. |
| Theaters | Per seat |
| Dairy or beef farms | Per head per acre |
| Parking garages | Per stall |
| Gasoline service stations | Per gallon pumped |

| | |
|---|---|
| Mineral deposits | Per unit of reserve |
| Office buildings | Per sq. ft. of net rentable area |
| Mobile home parks | Per pad |
| Auto repair shops | Per bay |
| Marinas | Per slip |

The adjustment of comparable sales is discussed in detail in *The Appraisal of Real Estate*.[65] In selecting a method of adjusting comparables in an eminent domain appraisal, it is most important that the method be consistent, logical, and easy to present and explain.

## PRESENTATION OF COMPARABLE DATA

Appraisers can choose from several options for presenting comparable sales data and analysis in the appraisal report and in appraisal testimony. In some instances, however, a condemning agency will specify the format in which the adjustment process should be presented in the appraisal report. According to one source "each significant element of difference between the comparable and the subject is explained separately on its own particular merits, with an indication as to its value differential made either on a dollar or percentage basis"[66] and to another "[s]imilarities or dissimilarities of each comparable used to compare to the subject shall be discussed and individually adjusted in dollars or percentage."[67] The *Uniform Appraisal Standards for Federal Land Acquisitions* leaves the specific presentation of the comparative process applied to the discretion of the appraiser:

> A narrative comparative analysis of each comparable sale shall be made explaining how the sale relates to the property under appraisal in respect to those features which have an effect on market value. The comparative weight given to each comparable sale by the appraiser in developing a final value estimate by this approach will be explained. A comparative adjustment chart, or grid, may assist the appraiser in explaining his or her analysis in this regard.[68]

It is interesting to note that *The Appraisal Guide*, which is published by the Federal Highway Administration to explain the appraisal process under the Uniform Relocation Assistance and Real Property Acquisition Policies Act,[69] states that sales *shall* be adjusted for each item of difference in dollar or percentage amounts, while the *Uniform Appraisal Standards for Federal Land Acquisitions* leaves the adjustment process to the discretion of the appraiser. A review of numerous appraisal reports prepared for state and federal condemnors suggests that some follow *The Appraisal Guide*, but most condemnors seem to allow the appraiser the flexibility described in the *Uniform Appraisal Standards for Federal Land Acquisitions*. *The Appraisal Guide* is just that—a *guide*; it does not establish standards or require-

65. *The Appraisal of Real Estate*, 10th ed., 371–402.

66. Washington State Dept. of Transportation, *Right of Way Manual*, Chapter 4, Appendix 4-1, Tab C, Item 4A1b, p. C-12.

67. U.S. Department of Transportation, Federal Highway Administration, *The Appraisal Guide* (Washington, D.C.: U.S. Government Printing Office, 1990), 39.

68. *Uniform Appraisal Standards for Federal Land Acquisitions*, §B-1 16, p. 76.

69. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, P.L. 91-646, as amended, 42 U.S.C. §4601, *et seq.*

ments. Some condemnors have incorporated the provisions of *The Appraisal Guide* into their appraisal standards or requirements, but most have chosen to retain flexibility in the comparable sales adjustment process. Appraisers are, therefore, advised to determine the reporting requirements of the specific agencies that have retained them.

A detailed comparative analysis, using dollar adjustments might follow the form shown in Table 10.1. Regardless of the reporting requirements, the appraiser must have detailed and accurate notes on the comparable analysis and the adjustments made. Also, a format for presentation of the comparable sales data and analysis to the trier of fact must be selected, generally in conjunction with legal counsel. In all but the simplest cases, a verbal presentation of sales data and anal–

**TABLE 10.1 COMPARISON CHART—SINGLE-FAMILY DWELLING: DOLLAR ADJUSTMENTS**

| Item | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|
| Sale price | N.A. | $75,000 | $85,000 | $82,500 | $78,500 |
| Sale terms | Cash | Equal, Cash | -$1,700 Loan fee | -$1,650 Contract | Equal Cash Equivalent |
| Adjusted price | N.A. | $75,000 | $83,300 | $80,850 | $78,500 |
| Sale date (market conditions) | N.A. | Equal 2 months | +$5,000 1 year | +$4,850 1 year | +$2,350 6 months |
| Adjusted price | N.A. | $75,000 | $88,300 | $85,700 | $80,850 |
| Site value | $12,000 | +$2,000 $10,000 | -$750 $12,750 | Equal $12,000 | +$800 $11,200 |
| Design/appeal | Average | Equal | Equal | Superior -$1,700 | Equal |
| Quality/condition | Good | Equal | Equal | Equal | Equal |
| Age | 1968 | Equal 1970 | -$1,700 1975 | Equal 1968 | Equal 1970 |
| Size | 1,450 sq. ft. | +$1,250 1,400 sq. ft. | -$1,750 1,520 sq. ft. | -$1,700 1,500 sq. ft. | Equal 1,450 sq. ft. |
| Bedrooms/baths | 3/2 | Equal 3/2 | -$1,000 4/2.5 | Equal 4/2 | Equal 3/2 |
| Utility | Average | Equal | Equal | Equal | Equal |
| Auto storage | 600 sq. ft. garage | Equal 560 sq. ft. garage | Equal 540 sq. ft. garage | Equal 620 sq. ft. garage | Equal 600 sq. ft. garage |
| Other | N.A. | Equal | -$1,000 Superior built-ins | Equal | Equal |
| Net location/physical adjustments | N.A. | +$3,250 | -$6,200 | -$3,400 | +$800 |
| Indicated value of subject | | $78,250 | $82,100 | $82,300 | $81,650 |

ysis is inadequate. To supplement the verbal testimony, the appraiser should submit sales data and analysis in table form.

There are several ways to present data for trial purposes, and each has its advantages and disadvantages. The format shown in Table 10.1 has the advantage of appearing detailed, well thought out, and mathematically correct. If the trier of fact disagrees with a specific adjustment made by the appraiser, it can be replaced and the indicated value of the subject property can be mathematically recomputed. The danger of using this type of presentation is that it invites questions upon cross-examination as to why each adjustment was made or not made. When this type of presentation is employed, the appraiser should be prepared to admit freely the possibility that a $500 adjustment could just as easily have been estimated at $400 or $600.

Table 10.2 illustrates the presentation of adjustment factors calculated by per-

**TABLE 10.2 COMPARISON CHART—SINGLE-FAMILY DWELLING: PERCENTAGE ADJUSTMENTS**

| Item | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|
| Sale price | N.A. | $75,000 | $85,000 | $82,500 | $78,500 |
| Sale terms | Cash | Equal, Cash | -2% Loan fee | -2% Contract | Equal Cash Equivalent |
| Adjusted price | N.A. | $75,000 | $83,300 | $80,850 | $78,500 |
| Sale date (market conditions) | N.A. | Equal 2 months | +6% 1 year | +6% 1 year | +3% 6 months |
| Adjusted price | N.A. | $75,000 | $88,300 | $85,700 | $80,850 |
| Site value | $12,000 | +3% $10,000 | -1% $12,750 | Equal $12,000 | +1% $11,200 |
| Design/appeal | Average | Equal | Equal | -2% Superior | Equal |
| Quality/condition | Good | Equal | Equal | Equal | Equal |
| Age | 1968 | Equal 1970 | -2% 1975 | Equal 1968 | Equal 1970 |
| Size | 1,450 sq. ft. | +2% 1,400 sq. ft. | -2% 1,520 sq. ft. | -2% 1,500 sq. ft. | Equal 1,450 sq. ft. |
| Bedrooms/baths | 3/2 | Equal 3/2 | -1% 4/2.5 | Equal 4/2 | Equal 3/2 |
| Utility | Average | Equal | Equal | Equal | Equal |
| Auto storage | 600 sq. ft. garage | Equal 560 sq. ft. garage | Equal 540 sq. ft. garage | Equal 620 sq. ft. garage | Equal 600 sq. ft. garage |
| Other | N.A. | Equal | -1% Superior built-ins | Equal | Equal |
| Net location/physical adjustment | N.A. | +5% +$3,750 | -7% -$6,181 | -4% -$3,428 | +1% +$809 |
| Indicated value of subject (rounded) | | $78,250 | $82,100 | $82,300 | $81,650 |

centages. This method of presentation has the same advantages and disadvantages as the presentation in Table 10.1. Note that the sale prices are first adjusted for financing and date of sale (market conditions), and the resulting adjusted sale price is used as the basis for location and physical difference adjustments. (If adjustments were required for the property rights conveyed or conditions of sale, these adjustments would also be made before the adjustments for location and physical differences.) The financing adjustment must be made before the location and physical difference adjustments because if it is not, the appraiser will be working with dollars that are not cash equivalent. The same is true with the market conditions adjustment. If the date of sale adjustment is not made first, the appraiser will be working with historical dollars as of the date of sale, rather than current dollars as of the date of valuation.

For example, consider a parcel of vacant land which sold for $7.50 per square foot. The property is comparable to the property being appraised, except that its location is 10% inferior. The adjustment would be calculated as follows:

| | |
|---|---|
| Sale price | $7.50 |
| Location adjustment (10%) | +0.75 |
| Indicated value of subject | $8.25 |

Now assume that the sale was not recent, but two years old, and the sale price was $6.52 per square foot. Assume also that, in addition to the location adjustment, a 15% upward adjustment is required for time. The adjustment process might be

| | | |
|---|---|---|
| Sale price | | $6.52 |
| Adjustments: | | |
| Time | +15% | |
| Location | +10% | |
| Net adjustment | +25% | +1.63 |
| Indicated value of subject | | $8.15 |

There should be no difference between the indicated values produced by these two processes. The reason there is a difference is that the location adjustment in the latter instance was not $0.75, as it was in the first scenario, but $0.65 ($6.52 x 0.10) because the 10% adjustment was applied to the historical sale price. This error could be corrected by applying a time adjustment to both the location and physical adjustments. The calculations are

| | | |
|---|---|---|
| Sale price | | $6.52 |
| Adjustments: | | |
| Time | +15.0% | |
| Location (10% x 1.15) | +11.5% | |
| Net adjustment | +26.5% | 1.73 |
| Indicated value of subject | | $8.25 |

For simplicity and clarity in trial presentations, adjusting the sale price for the date of sale and for financing prior to other adjustments is preferable. This process is shown as follows:

| | |
|---|---|
| Sale price | $6.52 |
| Time adjustment (15%) | 0.98 |
| Time adjusted price | $7.50 |
| Location adjustment (10%) | 0.75 |
| Indicated value of subject | $8.25 |

It has been said that the use of "[s]ome adjustment techniques tend to exaggerate results, particularly if all are subtractions, and others to minimize, if all [are] additions. For example, a +20% [adjustment] for location versus a $5.00 sale would suggest a +$1 [adjustment]. But if the $5 sale were first…[adjusted upward] 45% for other elements, reflecting $7.25, a +20% [adjustment] would be $1.45…. To level these variations or to expand them appropriately, each adjustment may be multiplied by the product of previous adjustments."[70]

Some appraisers use a factoring technique to make adjustments. For example, equality between the comparable property and the property being appraised would indicate a factor of 1.00, a 10% superiority of the property being appraised would result in a factor of 1.10, and a 5% inferiority of the property being appraised would indicate a factor of .95. When this procedure is applied to the preceding example, the adjustment for the date of sale is automatically applied to the location adjustment.

| | | |
|---|---|---|
| Sale price | | $ 6.52 |
| Adjustments: | | |
| Time | +10% | |
| Location | +15% | |
| Net adjustment (1.15 x 1.10) | | x1.265 |
| Indicated value of subject | | $ 8.25 |

However, this is not the case with multiple adjustments. To illustrate, consider the comparative adjustments shown in Table 10.3. It can be seen that a time

**TABLE 10.3 COMPARATIVE ANALYSIS OF VACANT LAND—PERCENTAGE ADJUSTMENTS**

| | | |
|---|---|---|
| Sale price per square foot | | $ 6.52 |
| Time adjustment (15%) | | 0.98 |
| Time-adjusted sale price per square foot | | $ 7.50 |
| Other adjustments: | | |
| Topography | +20% | |
| Location | +15% | |
| Shape | - 5% | |
| Utilities | +25% | |
| Access | +10% | |
| Net adjustment | +65% | 4.88 |
| Indicated value per square foot | | $12.38 |

70. John Cotton, "Market Data: Adjustment Techniques," *Condemnation Appraisal Practice*, vol. II (Chicago: American Institute of Real Estate Appraisers, 1973), 107.

adjustment of +15% was applied before any of the other adjustments were made. Adding the adjustments together indicates a total net adjustment of 65% and a final value indication of $12.38 per square foot for the property being appraised. Applying the factoring system of adjustment to the same circumstances, however, results in the value indication shown in Table 10.4. There is a substantial difference in the results produced by the two techniques, nearly 10%.

**TABLE 10.4 COMPARATIVE ANALYSIS OF VACANT LAND—FACTORING ADJUSTMENTS**

1.15 (Time) x 1.20 (Topography) x 1.15 (Location) x .95 (Shape) x 1.25 (Utilities) x 1.10 (Access) = 2.08

Indicated value per square foot ($6.52 x 2.08) = $13.56

The factoring technique was taught to appraisal students in the 1960s. Its use was encouraged because "[t]he comparison process cannot be reduced to an exact mathematical formula [and this factoring method of comparison]...is an example of the orderly mental process through which an appraiser might go in weighing the plus and minus items as between two properties."[71] Although the factoring technique was dropped from subsequent appraisal texts,[72] it has been reincorporated into more recent publications.[73]

Appraisers are particularly discouraged from using the factoring technique when presenting comparable sales data and analysis to a trier of fact. This process complicates an otherwise easily understood method of estimating market value. The main problem with using this technique is that the appraiser cannot testify on cross-examination as to the actual dollar adjustment made for any individual item. Moreover, the attorney representing the opposing party can take a composite factor developed by the appraiser and convert it into a net adjustment by adding and subtracting the percentage adjustments. Using this figure, he can then demonstrate to the trier of fact that the appraiser's analysis results in a totally different indication of value than the one to which the appraiser has testified.

For example, assume an appraiser is testifying on behalf of a property owner who owns 35,000 square feet of land. The appraiser uses the composite factor developed in Table 10.4 and presents an indicated value for the subject property of $475,000 (35,000 sq. ft. @ $13.56, rounded). The attorney representing the condemnor could then ask the appraiser on cross-examination to add and subtract the percentage adjustments shown in Table 10.3 and develop the indicated value of the property based upon these assumptions. The result would be $433,000 (35,000 sq. ft. @ $12.38, rounded), $42,000 less than the appraiser's original figure. It is more likely that the attorney would not ask the appraiser to make this computation, but instead do it for the jury himself during final argument. By then the appraiser will be off the witness stand and unable to defend his original estimate. Because the adding and subtracting of percentage adjustments is easier to under-

71. *The Appraisal of Real Estate*, 4th ed. (Chicago: American Institute of Real Estate Appraisers, 1964), 355.

72. *The Appraisal of Real Estate*, 7th ed. (Chicago: American Institute of Real Estate Appraisers, 1978), 59.

73. *The Appraisal of Real Estate*, 10th ed. (Chicago: Appraisal Institute, 1992), 392.

stand, the trier of fact may very well accept these later calculations rather than those originally presented. In this case the condemnor's counsel would be delighted because the newly computed value indication of $433,000 may be closer to the condemnor's indication of value than the condemnee's.

It is important for appraisers to recognize that dollar and percentage adjustments can, and sometimes should, be used together in the comparative analysis. For instance, percentage adjustments may be most appropriate for location and date of sale adjustments while other adjustments are better calculated in dollar amounts. If all of the comparables have sewer service, for example, and it would cost $5,000 to extend sewer service to the property being appraised, this adjustment should be made in dollars. If a percentage were applied, the sewer adjustment would vary depending upon the price of each comparable, and this would not reflect the real situation. A dollar adjustment should be made for any deficiency in the subject property that can be economically corrected. A dollar adjustment is also appropriate when the property under appraisal has a valuable attribute that can be assigned a dollar amount (e.g., merchantable timber) and is not present on the comparable sale property.

An appraiser may employ the comparative analysis techniques demonstrated in Tables 10.1 and 10.2, but elect to present the comparable sales data and comparative analysis in the manner shown in Table 10.5. This method can be altered

**TABLE 10.5 COMPARISON CHART—SINGLE-FAMILY DWELLING**

| Item | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|
| Sale price | N.A. | $75,000 | $85,000 | $82,500 | $78,500 |
| Sale terms | | = | – | – | = |
| | Cash | Cash | Loan fee | Contract | Cash Equivalent |
| Sale date | N.A. | = | + | + | + |
| | | 2 months | 1 year | 1 year | 6 months |
| Site value | | + | – | = | + |
| | $12,000 | $10,000 | $12,500 | $12,000 | $11,000 |
| Design/appeal | Average | = | = | – | = |
| | | | | Superior | |
| Quality/condition | Good | = | = | = | = |
| Age | 1968 | = | – | = | = |
| | | 1970 | 1975 | 1968 | 1970 |
| Size | | + | – | – | = |
| | 1,450 sq. ft. | 1,400 sq. ft. | 1,520 sq. ft. | 1,500 sq. ft. | 1,450 sq. ft. |
| Bedrooms/baths | | = | – | = | = |
| | 3/2 | 3/2 | 4/2.5 | 4/2 | 3/2 |
| Utility | Average | = | = | = | = |
| Auto storage | | = | = | = | = |
| | 600 sq. ft. garage | 560 sq. ft. garage | 540 sq. ft. garage | 620 sq. ft. garage | 600 sq. ft. garage |
| Other | N.A. | = | – | = | = |
| | | | Superior built-ins | | |
| Net adjustment | N.A. | +$3,250 | -$2,900 | -$200 | +$3,150 |
| Indicated value of subject | | $78,250 | $82,100 | $82,300 | $81,650 |

slightly by eliminating the specifics of the property being appraised and each comparable and simply indicating whether the comparable analysis suggests that the value of the property under appraisal is above or below the sale price of the comparable. Applying this technique to the data shown in Table 10.5 would change the last line in the table to:

| | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|
| Indicated value of subject | $75,000+ | $85,000- | $82,500+ | $78,500+ |

Both the method illustrated in Table 10.5 and the suggested variation have an advantage in that they avoid showing specific adjustments for each item of dissimilarity in the properties.

Properly presented, these methods can show the trier of fact that appraisal is not an exact science and that adjustments are not merely mathematical calculations or formulas. Rather, the adjustment process is a subjective comparison in which the appraiser's experience and judgment are more important than arithmetic computations. On the other hand, these methods of presentation open the appraiser to intense cross-examination in regard to specific itemized adjustments. Also, in the opposition's final argument it is often alleged that the appraiser's work was sloppy and the final estimate of value is only a guess.

Regardless of the method of sales presentation, some appraisers prefer to testify to one sale that is clearly superior to the property under appraisal and one that is clearly inferior to the property, providing no adjustments, to establish a minimum and maximum value for the property in question. Sometimes this procedure can be quite effective, especially when the highest and best use of the property is not being disputed. On occasion, however, it has been ruled that the trial court has the right to limit the number of sales that can be admitted by each appraiser or each party to the lawsuit.[74] In such an instance, the appraiser should carefully consider whether it is worthwhile to use some of the allocated number of sales for this purpose.

It is not necessary in all jurisdictions for the appraiser to testify to comparable sales. In fact, one court has said ". . . these witnesses were testifying as expert land appraisers, and that having so qualified, their opinion evidence, within the bounds of their expertise, would be acceptable in evidence even without giving the basis for the opinion."[75] Another court put it this way: "On direct examination [the appraiser] stated in general terms that his estimates of value were based on his experience in dealing with coal properties and on comparable sales. He was not asked to identify any particular sale he relied on. It was not necessary, in order for his testimony to have probative value, that he identify the comparable sales."[76]

When testifying in a jurisdiction where the appraiser may, but is not required to, justify the opinion of value presented, it is essential that the appraiser support

74. *United States v. 1,053.27 Acres of Land in Osage Co., Kan.*, 446 F.2d 1234 (10th Cir. 1971).

75. *Arkansas State H'way Comm. v. Hartsfield*, 454 S.W.2d 82, 84 (Ark. 1970).

76. *West Kentucky Coal Co. v. Commonwealth*, 368 S.W.2d 738, 741 (Ky. 1963).

his or her opinion on direct examination, by comparable sales as well as by other means. If this is not done, a prudent opposing counsel will probably not ask for the appraiser's comparables on cross-examination or may decline to cross-examine the witness altogether, particularly if the appraiser is well qualified and has a reputation as a good expert witness. This leaves the appraiser's opinion unsupported before the trier of fact, a circumstance which opposing counsel will be sure to point out during final argument. The argument will probably be, "Who are you going to believe? My appraiser, who testified to all of these comparable sales in the area, or the other appraiser, who testified to a totally unsupported guess?" Such a final argument is generally very persuasive.

Most jurisdictions require that an expert explain and support his or her opinion of value before the court will allow the opinion to be considered by the trier of fact. The Oregon court has said "[t]he witness testified that, taking into consideration adjustments, two parcels were comparable; but he failed to state what the adjustments were. It would have been improper for the court to admit the sale price until the adjustments were explained."[77] In Rhode Island, the court said:

> In the L'Etoile case [*L'Etoile v. Director of Pub. Works*, 89 R.I. 394, 402, 153 A.2d 173] the opinion of an admitted real estate expert as to the fair market value, based solely on his long experience, was held to have been properly excluded for the reason that to have admitted it without supporting data would have denied the opposite party an opportunity to conduct an intelligent cross-examination.[78]

In a later case, the same court said "[a]n expert may not give an opinion without describing the foundation on which his opinion rests."[79]

An extreme example of this requirement for justification and support of opinion evidence is illustrated by a New York case in which the court said:

> The claimant's appraiser did not give a dollars and cents adjustment in any instance between the comparable and the subject land; neither did he give a breakdown percentage-wise nor state the factors which entered into his judgment. His failure to do so affords no basis for review of his testimony and it is insufficient to justify an award.[80]

When testifying in a jurisdiction that has a propensity to favor specific supporting data, analysis, and documentation, the appraiser might be wise to use the method shown in Table 10.1 or 10.2 to present sales data and analysis.

## ADVANCED PROBLEMS

### CASH EQUIVALENCY SALES

The courts have universally acknowledged that market value is to be measured in terms of cash or its equivalent. However, most of the cases reported have dealt with comparable sales that involved property exchanges or other non-cash considerations, not sales on installment terms or other seller financing. When market

77. *State H'way Comm. v. Callahan*, 410 P.2d 818, 819 (Ore. 1966).

78. *Hunt v. Director of Pub. Works*, 206 A.2d 91, 94 (R.I. 1965).

79. *Nasco, Inc. v. Director of Public Works*, 360 A.2d 871, 876 (R.I. 1976).

80. *Geffen Motors, Inc. v. State*, 307 N.Y.S.2d 389, 389 (N.Y. 1970).

value is defined in terms of cash or its equivalent, appraisers now recognize that comparable sales sold on terms other than cash must be analyzed to determine whether the price paid was affected by the non-cash nature of the transaction.

> The appraiser shall analyze and make appropriate adjustments to any comparable sale that included favorable or unfavorable financing terms as of the date of sale, when comparing the sale to the property being appraised. Such adjustment must reflect the difference between what the comparable sold for with the favorable or unfavorable financing and the price at which it would have sold for cash or its equivalent.[81]

In one of the few reported cases that has addressed this issue, the court's ruling supports the appraisal requirement quoted above. In this case the property being appraised was purchased three years before the date of value. The purchaser made a down payment and was paying the balance of the purchase price, which was secured by notes, plus interest to the seller through monthly payments. The court ruled that the lower court should have given the jury a definition for the phrase "terms equivalent to cash." The court said:

> [M]arket value may be either what the property would sell for in cash or on terms equivalent to cash. These are alternative criteria for establishing the fair market value. [Citations omitted]
>
> The terms are equivalent to cash if the deferred purchase money notes are such that under normal conditions the notes can be turned into cash at their face amount. Thus, the principal of the notes is not increased by the addition thereto of a charge for credit. The rate of interest earned by the notes and their underlying security are factors to be considered in determining their cash value.[82]

Appraisers use a number of methods to adjust non-cash sales to a cash equivalent price.[83] However, "[w]hile cash equivalency of favorable or unfavorable financing can be estimated by discounting the contractual terms at current market or yield rates for the same type of property and loan term over the expected holding period of the property, the preferred method of estimating a proper cash equivalency adjustment is by the analysis of actual market data, if such data is available."[84] Because the courts have not addressed the appropriate methodology for adjusting non-cash sale prices to a cash equivalency value, the appraiser must be prepared to demonstrate the reasonableness of any cash equivalency adjustment made with market data.

If paired sales data are not available and the appraiser is forced to use a discounting process to equate the actual terms of the sale to typical financing terms, the appraiser should be prepared to demonstrate, with factual market data, the typical financing terms available at the time of the sale and how the typical holding period of the property was determined. The appraiser should also be ready to demonstrate the mathematics of the discounting process.

---

81. *Uniform Appraisal Standards for Federal Land Acquisitions*, §B-1 17, p. 76.

82. *Riley v. District of Columbia Redevelop. Land Agency*, 246 F.2d 641, 645 (D.C. Cir. 1957); see also, *Surfside of Brevard, Inc. v. United States*, 414 F.2d 915 (5th Cir. 1969). For a discussion of these cases, see Stanley J. Fineman, "Law and the Appraiser - Cash Equivalency: A Problem for Courts as Well as Appraisers," *The Appraisal Journal* (October 1985), 617-620.

83. For examples, see *The Appraisal of Real Estate*, 10th ed., 376-380, and the *Appraisal Journal* articles cited in the footnote on p. 377 of that text.

84. *Uniform Appraisal Standards for Federal Land Acquisitions*, §B-1 - 17, p. 77.

## SALES TO ENVIRONMENTAL ORGANIZATIONS

It has been noted that sales to government agencies are usually not admissible as comparable sales. What about sales to a party that does not have the right of condemnation, but is acquiring the land for the purpose of transferring its ownership to a condemnor? This question has not yet been addressed by the courts. Such situations often arise when a public project (e.g., a wildlife refuge) is authorized, but the acquisition has not been funded. An environmental organization might acquire lands within a project area for the sole purpose of transferring those lands, at the organization's cost, to the government when funding becomes available.

At times the relationship between the government agency and the environmental group is so close that the environmental group almost seems to act as an agent of the government. Appraisal reports commissioned by an environmental group for purposes of acquisition are prepared in accordance with the government agency's requirements and guidelines and, on occasion, may even be reviewed and approved by the government agency before the environmental organization makes the purchase.

Sales to environmental groups, under the conditions described, are obviously *project influenced*. It is not unheard-of for sellers of such lands to take (or attempt to take) a tax write-off for a contribution to the environmental group and claim its value in excess of the actual purchase price of the property. In many instances the property owners know that if they do not sell to the environmental group, they will be unable to sell their land on the open market because it has been designated as being within the government's authorized, but as yet unfunded, project area and is scheduled for government acquisition in the future. The motivation behind purchases by environmental groups, i.e., transfer to the government, is certainly not the motivation behind most market transactions, i.e., purchase to put the land to its highest and best economic use.

Because of these complications, appraisers should avoid using such sales if at all possible. If they must be used, objections should be anticipated, so careful verification is essential. The appraiser should determine whether the purchases were made based on competent appraisals and whether the appraisers' instructions, if any, specified that the market value of the property for its highest and best use be estimated. The appraiser's investigation should determine whether the environmental group's appraisal was written in accordance with government guidelines and whether the report was reviewed and approved by the government agency. If a tax write-off was claimed by the seller, an adjustment for this factor should be considered by the appraiser.

Even with verification of this additional information, some courts may exclude evidence of such sales. They are often so much a part of the government project for which the property is being acquired that no amount of verification or adjustment can totally remove the blemish from the sale.

## SALES TO THE GOVERNMENT

In a perfect world appraisers would always find an abundance of comparable market data and there would never be a need to even consider using a sale to the government as a comparable. Some governmental agencies have historically prohibited the use of sales to the government as comparables in their appraisals, while others merely discourage it. This position is somewhat justified because government purchases generally fail at least two of the seven tests used to determine whether a sale was an open-market transaction. When a government purchase occurs, the buyer and seller are not "typically motivated" and the property sold was not typically exposed in the open market.

But, because of the unique needs of some government agencies, there is sometimes an inadequacy of private market data with which to develop a reliable indication of market value. Indeed, without resorting to sales to the government as comparables, it would be impossible to develop an indication of market value by the sales comparison approach at all. The one positive aspect of this situation is that, unlike most private purchases, a government purchase and the decision-making process that led to it are usually well documented. The appraiser can take advantage of that documentation in the sales verification process. In fact, the appraiser *must* take advantage of it.

The legislation which authorized, or mandated, the purchase is, of course, available for inspection. It should be studied carefully to ensure that the purchase was not authorized for a price other than market value. Many acquiring agencies are required by law to release the information and data they relied on in making land purchases once the transactions are consummated. This information can include appraisal reports, appraisal reviews, the report or diary of the negotiator, correspondence relating to the acquisition, internal memoranda justifying the final acquisition price, and copies of all conveyance and closing documents. The type of information available and the difficulty encountered in obtaining it will vary from agency to agency. If adequate information is not willingly provided and a sale is critical to the appraisal, the appraiser may want to consider filing a formal request under the federal Freedom of Information Act or a similar state law.

Equally important is thorough verification of the sale with the seller. This can lead to additional information, such as whether the seller had the property appraised. Also sellers will sometimes sell at prices that they believe are below market value if they support the government's project, are simply tired of the protracted government negotiations (which in some circumstances go on for years), or want to avoid litigation.

The whole purpose of collecting this information is to ensure that any sale used as a comparable is a true representation of market value and that the price paid by the government is equivalent to the price that would have been paid for the property had it been sold to a private party. However, the fact that the price paid by the government was different from the value estimated in its approved

appraisal or was influenced by nonmarket factors does not necessarily invalidate the transaction as a reliable comparable sale. The government's appraisal is not the last word; it is not necessarily the only reasonable estimate of market value. Sales to the government at prices that are 10% to 15% above the appraised value should not necessarily be rejected as invalid comparable sales. Sales that are substantially higher than the government's appraised value do, however, require close scrutiny.

Some sales that have been affected by nonmarket factors can be adjusted and used as comparable sales. For example, if a fee simple estate was appraised and the government paid the appraised value, but as part of the negotiations the property owner retained a life estate in the property, the sale can be adjusted for the present value of the life estate, if such an adjustment is justified. Similarly, if an internal memorandum in the government's file indicates that the government agreed to pay a price higher than market value because the excess was less than the cost of a condemnation trial, a reasonable adjustment can be made for this factor.

If a sale to the government is used as a comparable, the appraiser must fully report the investigation and analysis that were undertaken to verify the sale. Because sales to the government are generally considered inadmissible, it is incumbent upon the appraiser to convince the reader of the appraisal report of the reliability of the sale as a valid and admissible indication of market value.

## SUMMARY

The sales comparison approach is widely accepted by the courts, at times to the exclusion of any other approach to value. Most courts will allow testimony regarding sales of similar property on direct examination in technical violation of the hearsay rule. In some jurisdictions these sale data are admitted as direct evidence of the market value of the property being appraised, while in others the evidence is admitted only in support of the expert's opinion. Jurisdictions that do not admit comparable sales data into evidence on direct examination will generally allow it on cross-examination, to test a witness's opinion.

A prior sale price of the property being appraised is admissible if the transaction was proximate to the date of valuation or taking, and no major physical changes to the property have taken place between the sale date and the date of valuation. It has been said that the prior sale of a property is the best evidence of its value. The appraiser has a professional obligation to consider and report any recent sale of the property being appraised, regardless of whether the price paid was market value and whether or not that price supports the appraiser's estimate of the property's value.

The selection of comparable sales is of utmost importance. Forced sales and sales to purchasers with the power of eminent domain generally do not meet the criteria of an arm's-length transaction and will often not be admitted as comparable sales. If an appraiser is forced to use sales to the government as comparables

because of a lack of private market transactions, the terms and conditions of the sales and the circumstances surrounding them should be extensively investigated and reported. The burden of demonstrating that such sales are not tainted is on the appraiser who uses them.

While the courts have not specifically ruled on the issue, sales to environmental groups for the purpose of ultimately transferring ownership of the property to the government may be viewed as tainted sales. In addition, sales in which the consideration included non-cash items such as property exchanges or personal property are also usually not considered *comparable*. Real estate contracts, or contract sales, have been admitted, but the price paid in such transactions must be converted to a cash or cash equivalency basis. Adjustments to sale prices should be supported by market data. The fact that a sale does not meet all the criteria of an open market transaction does not mean the appraiser cannot consider it, only that he or she cannot testify in regard to the sale.

Once an appraiser learns the price and terms of a nonmarket sale, how can he or she avoid considering it? A bell cannot be unrung and an appraiser cannot totally erase knowledge of the nonmarket sale from his mind. However, considering a sale, or any other factor, does not mean that it has influenced the appraiser's final value estimate. The appraiser certainly may and, in fact, should consider all sales with which he is familiar. Nevertheless, the appraiser should be prepared to testify, "I considered that sale, but gave it no weight because..."

A federal court has ruled on whether an expert witness's testimony should be allowed to stand after it appeared that the witness had based his appraisal, in part, on sales made to the United States under the shadow of condemnation. The judge said:

> Be that as it may, it would be absurd to exclude a qualified expert's appraisal because he had considered such evidence; indeed he ought to consider it; it is part of the data on which his opinion should rest. It is just because he is an expert, and for that reason able to give its proper weight to all data, that he is allowed to appraise the property at all. No court has held, so far as we can find, that his opinion shall not be received because it is so based in part; and we should not follow its ruling, if there were one, unless we had no escape.[85]

When Justice Holmes was serving as Chief Justice of the Supreme Judicial Court of Massachusetts, he also addressed this issue: "An expert may testify to value, although his knowledge of details is chiefly derived from inadmissible sources, because he gives the sanction of his general experience. But the fact that an expert may use hearsay as a ground of opinion does not make the hearsay admissible."[86]

This is not to say that an appraiser's opinion will be admitted if his value estimate is based entirely on sales that do not meet the criteria of market value. "Where a witness testifies as to value and bases his opinion entirely upon im-

85. *United States v. Delano Park Homes*, 146 F.2d 473, 475 (2d Cir. 1944).

86. *National Bank of Commerce v. City of New Bedford*, 56 N.E. 288, 290 (Mass. 1900).

proper considerations or incompetent and inadmissible matters, his testimony may be properly stricken from the record."[87] [Citations omitted]

If verification of a sale indicates that the price was representative of market value, the appraiser should determine the overall comparability of the sale property. In verifying a comparable sale the appraiser must take care to confirm that the parties to the transaction were *knowledgeable*. The appraiser must consider how that term has been defined by the courts in the jurisdiction where any dispute concerning the value of the property under appraisal will be heard. If the sale property being appraised could have fairly competed with the sale property for a buyer, had it then been competitively offered, the sale can generally be considered, from a physical, locational, and economic standpoint, to be a comparable sale. If the property meets this test of comparability, the appraiser may then make a comparative analysis of this property and the property being appraised.

Adjustments are made to the sale price of a comparable property for property rights conveyed, financing terms, market conditions, location, and physical characteristics. On occasion, an additional adjustment is required for conditions of sale. The indicated values developed in the comparative analysis of the sale properties are then correlated into a final value estimate for the property being appraised. This correlated value is *not* an average of the various value indications developed. It has been ruled on several occasions that to average the comparable sales prices is a faulty procedure.[88]

Appraisers often have several options for presenting comparable sales data and analysis in an appraisal report. Appraisal reporting standards or requirements may limit these options. Appraisers can also choose from several formats when presenting sales data and analysis to the trier of fact. However, this selection should never be made by the appraiser alone, but by mutual agreement between the appraiser and legal counsel. The presentation format selected should be simple, clear, and logical. Applicable case law concerning the amount of reasoning required to support an opinion of value may also influence the manner in which the appraiser presents sales data and analysis.

87. *City of Gilroy v. Filice*, 34 Cal. Rptr. 368, 375 (Cal. 1963).

88. *Latham Holding Co. v. State of New York*, 209 N.E.2d 542 (N.Y. 1965).