# Real Estate Valuation in Litigation

Second Edition



J.D. Eaton, MAI, SRA

Appraisal Institute

CHAPTER 14

# Damages in Partial Taking Cases

Two definitions of *damages* follow:

> In condemnation, the loss in value to the remainder in a partial taking of a property. Generally, the difference between the value of the whole property before the taking and the value of the remainder after the taking is the measure of the value of the part taken and the damages to the remainder.[1]

> Two types of damages are recognized: consequential and severance.[2]

Of course, damages cannot result when the sovereign acquires the entire ownership because compensation is made for the taking of the total property, and there is no remainder left to damage.

Consequential damages and severance damages are defined as follows:

> **Consequential damages**—A damage to property arising as a consequence of a taking and/or construction on other lands. In many states owners may be compensated for damage as a consequence of a change in grade of a street which adversely affects ingress to and egress from the affected property. In some states property owners are not legally entitled to consequential damages which occur to their real estate. Owners may not be compensated for damage to business, frustration, and loss of goodwill which result as a consequence of a taking or construction by the government.[3]

> **Severance damages**—It is the diminution of the market value of the remainder area, in the case of a partial taking, which arises (a) by reason of the taking (severance), and/or (b) the construction of the improvement in the manner proposed.[4]

1. *The Dictionary of Real Estate Appraisal*, 3d ed. (Chicago: Appraisal Institute, 1993), 87.
2. American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers, *Real Estate Appraisal Terminology*, rev. ed., Byrl N. Boyce, ed. (Cambridge, Mass.: Ballinger Publishing Company, 1981), 69.
3. Ibid., 57.
4. Ibid., 218.

From these definitions it might be concluded that all consequential damages arise from the taking of, or construction on, property other than that consequently damaged, and that this type of damage may or may not be compensable or actionable. Severance damages are generally considered compensable.

The terminology used to describe damages creates confusion between the appraisal and legal professions and within the legal profession itself. According to *Nichols'*, "The term 'consequential damage' has justly been described as ambiguous, irrelevant, equivocal and a deterrent to any hope of a clear understanding of the issue at hand."[5] It "has become a term of art in addressing an issue rather than a term of accurate definition."[6] The first definition of consequential damages given above, which states "[a] damage to property arising as a consequence of a taking and/or construction *on other land*" is, at best, misleading. One example of consequential damage (i.e., noncompensible) cited is "damage to business," but this is generally considered a consequential damage, irrespective of whether it is due to the taking of and/or construction on lands owned by others or is a result of the taking of and/or construction on land that was part of the property in question.

A reading of the various authoritative texts and case law leads to the inescapable conclusion that the use of the term *consequential damages* introduces nothing but confusion to what, from a valuation standpoint, would merely appear be a question of compensability. After a lengthy discussion, *Nichols'* concludes:

> This Treatise deals with issues involved in the exercise of the right of eminent domain. Consequently, all references to "consequential damages" accurately mean damages resulting from acts not amounting to a taking or damages following the taking but caused by intervening and supervening acts of others than the taking authority. If those activities do not amount to a taking, then the damages are a consequence of the taking activities and although they may be addressed on theories of tort, contract, trespass, etc., such activities are not the proper subject of a claim for damage flowing from the exercise of the right of eminent domain by a sovereign.[7]

The general use of the terms *consequential damage* and *severance damage* would appear to be an attempt to differentiate between noncompensable (consequential) damages and compensable (severance) damages in an eminent domain action. It is difficult to understand why these confusing terms continue to be used, particularly in the eastern United States. To avoid confusion here, the terms *consequential damages* and *severance damages* will be replaced with the terms *noncompensable damages* and *compensable damages*. Any further classification of damage is too pedantic for the purposes of this (or most other) discussions.

## MEASURE OF DAMAGE

Damages can only result from a partial taking.[8] The taking need not be a physical taking, but may be the taking of a property right. "In this regard, what constitutes

5. *Nichols' The Law of Eminent Domain*, rev. 3d ed. (New York: Mathew Bender Co., Inc., 1992), vol. 4A, §14.01[4].
6. Ibid., §14.01[2].
7. Ibid.
8. *In re Condemnation of 2719.21, 11 E. Berkshire St.*, 343 A.2d 67 (Penn. 1975).

Case 3:16-cv-00315-HLA-J_T Document 72-3 Filed 01/02/18 Page 4 of 35 PageID 3597


a 'taking' of private property is not susceptible of facile definition, but it is axiomatic that 'it is the character of the invasion [by the sovereign], not the amount of damage which results from it...' which determines the question of whether there has been a taking."[9] For instance " ...a material injury to the easement of view is a taking of property..."[10] as is the placement of cable television facilities (36 feet of cable one-half inch in diameter and two, 4-in. x 4-in. x 4-in. metal boxes occupying one-eighth of a cubic foot) on the roof of a five-story apartment building.[11] It is the damage to that part of the tract not taken which is compensable, in addition to the property or property rights actually taken. This damage arises from the actual taking and/or from the use of the land taken in the manner proposed.

Damages are often dependent on the construction on, or other utilization of, the land acquired by the condemnor. For example, if the acquisition depicted in Figure 14.1 is for public park purposes, any damages to the remainder would be considered differently than if the land were being acquired for construction of a limited-access interstate freeway. Before an appraiser begins to estimate damages to a remainder property, he or she must have a thorough understanding of the proposed use of the portion of the tract being taken by the condemning agency.

**FIGURE 14.1 UTILIZATION OF THE AREA TAKEN**




The appraiser must also fully understand what rights are being acquired by the condemnor. The property owner is entitled to consideration for the damage the condemnor has the power to inflict. The appraiser should assume that the condemnor will utilize the rights acquired to their fullest extent.[12]

Nevertheless, it cannot be assumed that the condemnor will put the property taken to the use that is most damaging to the remainder.[13] The appraiser must determine whether the condemnor is required to put the land taken to the specific use proposed on the date of valuation or whether the condemnor has the right to expand or change the use of the land taken at some future date.

9. *Florida East Coast Properties, Inc. v. Metropolitan Dade County*, 572 F.2d 1108, 1111 (5th Cir 1978) *cert. denied*, 439 U.S. 894 (1978).

10. *Bramson v. Berea*, 293 N.E.2d 577 (Ohio 1971).

11. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).

12. *Western Union Tel. Co. v. Polhemus*, 178 F. 904 (3rd Cir. 1910).

13. *United States v. River Rouge Co.*, 269 U.S. 411 (1926).

For example, Figure 14.2 illustrates a proposed taking for a new limited-access highway and shows the proposed plan of construction for the project. The appraiser must consider whether the condemnor is limited in its utilization of the area taken. Could the condemnor at a later date expand or realign the highway facility and bring the traveled roadway to within 20 feet of the dwelling located on the remainder? If this is the case (and it generally is), the damage is not measured as if the planned expansion had or will take place, but rather in recognition of the condemnor's right to expand its use without additional compensation. It is not what the condemnor actually *does* or *plans to do* with the land acquired that determines the amount of damage suffered by the remainder, but rather what the condemning agency *acquires the right to do*.[14]

**FIGURE 14.2 PROPOSED UTILIZATION OF THE LAND TAKEN**




This type of damage is generally measured by analyzing sales of properties that are similar to the property under appraisal in the after situation. Analysis of sales will often show whether buyers and sellers in the market believe that the likelihood of future highway expansion is significant enough to affect the current market value of the property in question.

In analyzing such situations, appraisers must keep this question in mind: If the government does not plan on utilizing all of the rights that it is acquiring, then why is it acquiring them? If a power company is acquiring a transmission line easement for the stated purpose of constructing one 230 kilovolt (kv) power

14. *Manlius Center Road Corp. v. State*, 370 N.Y.S.2d 750 (N.Y. 1975).

line and has no intention of constructing additional lines or increasing the voltage of the line, the rights to be taken should read "an easement for the construction and operation of one 230 kv electrical transmission line," not "an easement for the construction and operation of electrical transmission lines."

> If the State wishes to limit its rights under the easement to the continuance of the presently existing use or to the prospective use envisaged by its expert, it should do so by formal action, by deed, release or otherwise. In the absence of such modification, the damage must be evaluated on the basis of what the State has the right to do under the terms of the easement appropriated.[15]

Another question the appraiser must consider is: Can the condemnor at a future date partially or totally change the use for which the property is being acquired? Can a municipality acquiring land for park purposes later convert the land into a landfill site? Consider Figure 14.3, which depicts an actual situation in which an easement for the construction and maintenance of a drainage canal was acquired. A number of years later, the condemnor devised a plan to use the canal maintenance area as a public bicycle and pedestrian path as well as for canal maintenance. In this case the condemnor's right to put the easement area to this additional use, without acquiring any additional rights or paying additional compensation, hinged on the specific wording of the original easement.[16]

**FIGURE 14.3 RIGHTS ACQUIRED**




This example highlights the importance of determining exactly what rights are being acquired by the condemnor. If satisfactory clarification cannot be provided by the acquiring agency, the appraiser must obtain legal instructions in regard to the rights being acquired. Whenever possible, a written copy of the

15. *Spinner v. State*, 167 N.Y.S.2d 731, 733 (N.Y. 1957).

16. The agency dropped its plan when it was learned that the expanded use of the easement area would constitute an additional taking and thus require additional compensation.

proposed taking—e.g., the declaration of taking or the easement form—should be obtained by the appraiser and included in the appraisal report. For self-protection the appraiser must always explicitly state the rights that are assumed to be acquired in both the appraisal report and in valuation testimony. This point is further illustrated in Figure 14.4.

**FIGURE 14.4 SAMPLE CROSS SECTION OF ALLOWABLE CONSTRUCTION WITHIN EASEMENT**




In this case an easement was being acquired for the construction of a levee. The appraiser asked the condemnor to clarify what rights the underlying fee owner would retain in regard to construction within the easement area. When the condemnor's engineer indicated that construction within the easement area would require a permit, the appraiser advised the condemnor that the appraisal would have to be based on the assumption that the condemnor would exercise its rights to the fullest and that no construction within the easement area would be allowed. Discussions with the condemnor and its legal counsel led to the adoption of the drawing shown in Figure 14.4, which was attached to the easement acquired and identified as an illustration of the type of construction that would be allowed within the easement area and for which a permit would be issued. The appraiser included in the appraisal report a copy of the proposed easement and the drawing of "allowable construction."

Two years after construction of the levee, the condemnor found that the elevation of the levee had to be raised, which required an additional easement taking. The condemnor retained the same appraiser to value the property for the second easement taking, which specifically provided that construction within the easement area would not be allowed. The condemnor's legal counsel provided the appraiser with a legal instruction to the effect that construction within the

first easement area would require a permit from the condemnor and that the appraiser was to assume that such a permit would be denied. The appraiser refused to accept the legal instruction and, after a review of the appraiser's appraisal report for the first easement taking (which included the drawing of "allowable construction" and the written assumption and limiting condition that such construction would be permitted), the legal instruction was withdrawn. If the appraiser had not insisted upon written clarification of the rights retained by the owner of the land when the first easement was taken and included a comprehensive description of these rights, the owner of the property might well have received substantially less than that to which he was due.

In many jurisdictions appraisers are not technically required to identify specifically or estimate the dollar amount of damages for condemnation trial purposes. They need only estimate the market value of the property before the partial acquisition and the market value of the remainder property immediately after the proposed acquisition. "Notwithstanding the foregoing, appraisals should contain an allocation between the value of the property being acquired and damages to the remainder."[17] Many condemning agencies require this allocation.[18] One reason for this requirement is that payment for the taking and payment for damages to the remainder property are treated differently for income tax purposes. Also, from a practical standpoint, the appraiser must attempt to isolate and identify all elements of damage present in the remainder property. This is not to say that the appraiser must, or even should, estimate a specific dollar amount for each item of damage, only that each should be acknowledged and considered.

Whether the appraiser is working under the *federal rule* or *state rule* of measuring just compensation, the procedural steps of valuation are the same. (See Chapter 3 for a discussion of these two measures of just compensation.) The estimate of damages should be no more conjectural or speculative than the appraiser's estimates of market value before and after the acquisition. Damage estimates must exclude highly improbable damages, but reflect those damages that would be considered significant by prudent buyers and sellers. "[S]trict proof of the loss in market value to the remaining parcel is obligatory."[19] "[T]he extent to which the utility of the property has been destroyed and its market value diminished must necessarily be established by factual data having a rational foundation in support of such a claim."[20]

The appraiser measures damages, not as an end in itself, but to assist in estimating the value of the remainder tract. "Under the Federal rule, compensation is paid for 'takings' not 'damages.'"[21] In other words, the estimate of damages is the basis for arriving at an adjustment that will be applied to various market data in valuing the property in the after situation. One of the most commonly used and reliable methods of estimating damage is by analyzing comparable sales using the matched pairs, or paired data analysis, technique.[22] Damages can also be estimated by capitalizing the net rent loss resulting from the damage.

17. *Uniform Appraisal Standards for Federal Land Acquisitions* (Washington, D.C.: U.S. Government Printing Office, 1992), §A-11, p. 34.

18. U.S. Department of Transportation, Federal Highway Administration, *The Appraisal Guide* (Washington, D.C.: U.S. Government Printing Office, 1990), 9.

19. *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 179 (9th Cir. 1950), *cert. denied*, 340 U.S. 820 (1950).

20. *United States v. 26.07 Acres of Land in Hempstead*, 126 F.Supp. 374, 377 (E.D.N.Y. 1954).

21. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-11, p. 31.

22. For a description of this analytical technique, see *The Appraisal of Real Estate*, 10th ed. (Chicago: Appraisal Institute, 1992), 394-397.

A third method applied to estimate a proper adjustment for damage is known as the *cost to cure*. This method can be used when the property being appraised has suffered damage that can be physically and economically corrected,[23] e.g., through correction of drainage, replacement of fencing, reestablishment of physical access, or replacement of sewage or water systems. Under no circumstances can the cost to cure measure of damage be applied if the cost to cure exceeds the diminution in value that would result if such a cure were not undertaken.[24] However, if the cost to cure is less than the diminution in the value of the remainder, the cost to cure measure of damage *must* be used.[25]

Although *Nichols'* suggests that the cost to cure measure of damage is an *exception* to the before and after method of valuation and determination of compensation,[26] this measure of damage actually ensures conformance with the rule. If a property with a deficiency is placed on the market, both the buyer and seller will consider the cost to cure the deficiency, if it is physically and economically curable. The price at which the property will sell is the value of the property as deficient or the value of the property without the deficiency minus the cost to cure the deficiency, whichever is higher. If a remainder property lacks a connecting road approach, or driveway, to an abutting road, it would be illogical to estimate the market value of the remainder property as if it would be landlocked in perpetuity. If a road approach could physically and legally be constructed, the value of the property would be its market value with access minus the cost of constructing the access, unless the cost to construct the access exceeded the difference between the value of the property with access less the value of the property as landlocked.

The measure of damages cannot be based on an assumption that adjacent land can be acquired,[27] but the appraiser can consider the general availability of suitable replacement property. This is particularly true when the property in question is a noncontiguous larger parcel.[28] Figure 14.5 illustrates the misuse of such an assumption. In this situation it would be improper to estimate the damage to the remainder of Parcel A as the cost of acquiring Parcel B.

**FIGURE 14.5 ACQUISITION OF OTHER LANDS**




23. *State Highway Comm. v. Speck*, 324 S.W.2d 796 (Ark. 1959).
24. *Arkansas State Hwy. Comm. v. Pink*, 364 S.W.2d 794 (Ark. 1963).
25. *United States v. Dickinson*, 331 U.S. 745 (1947).
26. *Nichols'*, vol. 8A, §16.01[2] (1992).
27. *Utah Dept. of Trans. v. Rayco*, 599 P.2d 481 (Utah 1979); *Jeffery v. Osborne*, 129 N.W. 931 (Wis. 1911).
28. *International Paper Company v. United States*, 227 F.2d 201 (5th Cir. 1955).

By contrast, consider a situation in which 9,500 acres are to be taken from a 25,000-acre tract of timberland. Assume that the timberland is held, along with other lands, as a source of raw material for a paper mill 136 miles away. The mill property and the timberland holdings constitute a unitary use, and are thus a single larger parcel. In an actual case similar to this scenario, the owner's appraiser estimated damages to the mill property "without taking into consideration whether other lands were available for purchase that would in all respects make up the deficiency resulting from the taking." The owner claimed that "the availability of other lands made absolutely no difference in ascertaining that the mill property became worth $46 less for each acre of land that it lost or disposed of." The court found this approach "clearly fallacious," pointing out that "the record show[ed] that [the property owner] actually purchased 100,000 acres of land subsequent to the taking..." of the 9,500 acres.[29] The court found

> [The owner's] contention that it is entitled to receive what amounts to approximately three times the value of the land taken upon the theory discussed above, not only offends the court's sense of justice, but it also offends any rules relating to the awarding of just compensation for property taken for public use. There is no authority for such proposition.[30]

The key to this debate appears to be that the appraiser can consider the availability of replacement land in general, but he or she cannot consider the availability and cost of acquiring any other *specific* parcel in estimating a cost to cure adjustment.

An appraiser who uses the cost to cure method to estimate a proper adjustment must take care to include all the costs that will be incurred. The appraiser must remember that the property is being appraised in its uncured condition. Thus a purchaser of the property in the after situation will acquire it recognizing the need to cure the damage and incur the direct costs of correction. In addition, the typical purchaser will demand an incentive to purchase the damaged parcel. Many appraisers make the mistake of not considering this incentive, or *entrepreneur's profit*, in estimating a cost to cure adjustment.[31]

To illustrate the fallacy of this methodology, consider two identical (or nearly identical) single-family properties (Parcels A and B), each with a before value of $75,000 (see Figure 14.6). An underground utility easement is to be acquired across both parcels. After a detailed analysis of comparable properties, the appraiser concludes that the existence of such an easement, in and of itself, does not result in any diminution in the values of similar properties. However, the septic tank and drain field systems serving Parcel A are located within the easement area and they will have to be relocated. No such condition exists on Parcel B.

The appraiser obtains a firm bid from a local contractor who for $3,500 can replace the septic tank on Parcel A and repair the lawn. The new system can be installed about 30 days after authorization to begin the work is received and

29. Ibid., 207.

30. Ibid.

31. Even when the appraiser does include an entrepreneur's profit in the cost to cure estimate, some condemnors delete this amount from the indicated just compensation before making the property owner an offer of settlement.

**FIGURE 14.6 PARTIAL TAKING**




there will be no loss of sewer service during the installation. Using this information the appraiser draws the following conclusions:

**Valuation of Parcel A**

| | |
|---|---|
| Before value | $75,000 |
| Minus after value ($75,000 – $3,500 cost to cure) | –71,500 |
| Difference | $ 3,500 |

**Valuation of Parcel B**

| | |
|---|---|
| Before value | $75,000 |
| Minus after value | –75,000 |
| Difference | $ 0 |

The appraiser must remember that the value of Parcel A in the after situation is estimated in its *as is* condition.

Assume that immediately after the easement taking both Parcel A and Parcel B are placed on the open market for sale; Parcel A is listed at $71,500 and Parcel B at $75,000. Now, a potential purchaser inspects both of the properties and decides to acquire one of them. Which one will it be? Will the purchaser buy Parcel B, which has a functioning septic system, for $75,000, or will he acquire Parcel A for $71,500 knowing that an additional $3,500 will have to be spent to install a new septic system?

Case 3:16-cv-00315-HLA-J_T Document 72-3 Filed 01/02/18 Page 12 of 35 PageID 3605


Obviously a prudent purchaser would acquire Parcel B to avoid waiting for the installation of a new septic system and the hassle of obtaining the necessary installation permits and dealing with the contractor. This situation is analogous to a situation in which a building contractor offers to sell a potential purchaser a newly completed house or to build an identical house on the lot next door for the same price. All else being equal, the purchaser will take the existing house to avoid the hassle and delay that accompany any construction project.

Returning to the example, it is clear that the damage to Parcel A exceeds the direct cost to cure. The purchaser who acquires Parcel A in its *as is* after condition will need some incentive to undertake the construction project required as a result of the taking. To account for this factor, the appraiser adds an *entrepreneurial profit* to the direct cost to cure, either in the form of a percentage of the contract bid or as a flat dollar amount. To give no consideration whatsoever to entrepreneurial profit in estimating an appropriate cost to cure adjustment is ludicrous.

Consider another scenario in which the cost of replacement fencing is being estimated. In this case care must be taken to recognize all forms of depreciation in the remainder fencing. For example, assume the property shown in Figure 14.7 includes a perimeter chain-link fence 600 feet long in the before situation. The fence has a replacement cost of $10.50 per linear foot and a contributory, or depreciated, value of $8.00 per linear foot, or $4,800. The difference between the contributory value of the fencing and its replacement cost can be attributed to physical deterioration.

**FIGURE 14.7 PARTIAL TAKING OF FENCE**




One hundred linear feet of fencing will be taken in partial acquisition. The value of the fencing taken is $800 (100 lin. ft. x $8.00). However, the remaining

fencing may suffer from additional functional obsolescence because it has a 100-ft. gap. It will cost $10.50 per linear foot, including entrepreneurial profit, or $1,050, to close the gap. The proper procedure for estimating the contributory value of the fence before and after the taking is shown in Table 14.1.

**TABLE 14.1 CONTRIBUTORY VALUE OF FENCE**

| | | | |
|---|---|---|---|
| Before value (600 lin. ft. @ $8.00) | | | $4,800 |
| After value: | | | |
| Replacement cost of fencing (500 lin. ft. @ $10.50) | | $5,250 | |
| Less depreciation: | | | |
| Physical (500 lin. ft. @ $2.50) | $1,250 | | |
| Functional—excess cost over value to reconnect fencing 100 lin. ft. @ $2.50) | + 250 | | |
| Less total depreciation | | -1,500 | |
| Total value of fencing—after taking | | | -3,750 |
| Just compensation for taking and damages to fence | | | $1,050 |

The total or partial taking of a private water supply system or sewage disposal system can be analyzed in much the same way. The appraiser must inspect the property closely and interview the property owner to determine whether such underground improvements will be affected by the proposed acquisition. If the system must be replaced, it is imperative that the appraiser determine whether the local health authority will approve the replacement and, if so, under what terms and conditions. Assuming physical replacement can be accomplished, the cost of the replacement should then be established.

It is generally of little consequence how many dollars an appraiser assigns to the value of the portion of the sewage disposal system taken and how much is allocated to damages to the remainder of the system.[32] Normally the value of the part of the system taken plus damages to the remainder property will equal the cost of restoring the remainder system. In some areas, however, it is difficult to estimate the cost of drilling a well so a *well agreement* may be made between the condemnor and the condemnee. Such an agreement stipulates that the condemnor agrees to replace the well taken, at its cost, with one of equal quality on the remainder site. In this situation the appraiser can usually assume that the remainder property includes a domestic water system equal to the one that existed before the taking.

There are literally dozens of reported cases in which appraisers have failed to consider the depreciation in remainder fencing.[33] There are also a number of cases in which an appraiser, applying the state rule, has included the value of the fence in the taking and then estimated a cost to cure damage equal to the cost to replace the fencing.[34] Of course, this methodology results in over-compensation.

32. The amounts allocated do make a difference in situations where the remainder property is specially benefitted and, under applicable law, special benefits can be offset against damages but not against the value of the taking.

33. *State v. McNary*, 664 S.W.2d 589 (Mo. 1984).

34. *United States v. 2.33 Acres*, 704 F.2d 728 (4th Cir. 1983).

Returning to the earlier example and the calculations shown in Table 14.1, the careless appraiser might mistakenly estimate compensation as follows:

| | |
|---|---|
| Value before taking (600 lin. ft. @ $8.00) | $4,800 |
| Less value of taking (100 lin. ft. @ $8.00) | 800 |
| Remainder value before taking | $4,000 |
| Less remainder value after taking (500 lin. ft. @ $8.00 minus cost to cure 100 lin. ft. @ $10.50) | -2,950 |
| Damages | $1,050 |
| Special benefits | 0 |
| Net damages | $1,050 |
| Value of part taken | 800 |
| Total compensation due | $1,850 |

These calculations demonstrate how easily the state rule can be misapplied and why many courts and authoritative texts advise against its use. Another common error made by appraisers in regard to fencing is violation of the *consistent use theory*. (See Chapter 6 for a discussion of consistent use.) For example, an appraiser might conclude that the highest and best use of a fenced farm operation is for subdivision purposes and then try to compensate the owner of the property for the fencing within the taking and/or for damages to the remainder fencing. This violates the consistent use theory because, in all probability, the fencing would add no contributory value to the value of the whole property put to its highest and best use as a subdivision. Either the land is farmland, to which a fence contributes value, or it is subdivision land, to which a fence adds no value. The owner cannot have it both ways, and the appraiser cannot appraise it both ways.

## Condemnor's Use of the Land Taken

In measuring damages to a remainder property, the appraiser must consider only those elements of damage that are compensable in the applicable jurisdiction and under the specific circumstances of the case. Many jurisdictions use the following rule:

> Allowable "severance [compensable] damages" include diminution in the value of the remainder because of the use to which the [condemnor] will put the part taken; however, diminution in value of the remainder because of the use to which the [condemnor] will put the land taken from others or from use of land it owns cannot be considered.[35]

The foregoing rule has as its genesis *Campbell v. United States* and is commonly referred to as the *Campbell Rule*.[36] This is one of those rules adopted by the courts that appraisers often find impossible to apply in the real world. Figure 14.8 depicts a situation in which the Campbell rule could be applied. Assume that the

35. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-11, p. 32.

36. *Campbell v. United States*, 266 U.S. 368 (1924).

**FIGURE 14.8 USE OF LANDS TAKEN FROM OTHERS**




government has taken from others all the lands necessary for the construction of a dam and establishment of a reservoir behind it. The area taken from the property under appraisal is to be used for mitigation of the wetlands destroyed as part of the dam and reservoir project. The area taken will be left in its existing, natural state. In valuing the remainder property under the Campbell rule, the appraiser must exclude from consideration any effect on value caused by the use to which the government has put land taken from others—in this case the entire dam and reservoir. The only damage that can be considered by the appraiser is the diminution in value caused by the taking itself and by the use to which the government will put the land taken, i.e., wetlands mitigation.

Few cases are so straightforward. Refer back to Figure 14.2 and application of the Campbell rule becomes more difficult. Under the rule only damages resulting from the portion of the highway situated on the area taken could be considered. In this case, then, traffic noise might be considered a damaging factor, but only the traffic noise emanating from northbound cars and only when those cars are physically on the portion of the highway located in the area taken. It has been recognized that in such situations "it is difficult, if not impossible to separate one element [of damage] from the other..."[37]

The theory behind the Campbell rule was explained by the Court as follows:

> If the former private owners [of the abutting lands] had devoted their lands to the identical uses for which they were acquired by the United States or to which they probably will be put, as found by the court, they would not have become liable for the resulting diminution in value of plaintiff's property. The liability of the United States is not greater than would be that of the private users.[38]

Of course, this decision was made in 1924, when zoning was almost unheard of in the United States. It also fails to address the fact that few private owners construct dams, highways, or military bases, nor do they operate bombing ranges or nuclear missile sites.

> [O]ne might logically urge that the nine Justices of the Supreme Court in 1924, using their analysis as set forth in Campbell, could not possibly have envisioned 10,000 cars passing a point of land travelling at an average speed of sixty-five miles per hour in one twenty-four hour period. It is equally illogical to presuppose that, had they envisioned such facts, they would have concluded that the damage to Campbell's remainder was separable from the contribution to that damage from the land of others taken for the same project.[39]

Some jurisdictions have taken exception to the Campbell rule, especially when the damages caused by the use of the land taken from the subject parcel are inseparable from the damages caused by the use of the land taken from others. As one court put it:

> For the purpose of determining severance [compensable] damage to the part not taken, the part of the defendant's land taken is to be considered as an integral and inseparable part of a single highway project not limited to the segment of the highway on his land but extending so far as the construction and use of the highway has a reasonable tendency to cause detriment to the part not taken and to reduce the market value of his land not taken from the viewpoint of a ready, able and willing buyer.[40]

The U.S. Court of Appeals for the Ninth Circuit has reviewed the Campbell rule on two occasions—in 1961 and 1982.[41] Commenting on the 1961 case, the court in the 1982 case said:

---

37. *Commonwealth v. Williams*, 487 S.W.2d 290 (Ky. 1972).
38. *Campbell v. United States*, 266 U.S. 368, 371–372 (1924).
39. *Nichols'*, vol. 4A, §14.01[4] (1992).
40. *State Highway Comm. v. Bloom*, 93 N.W.2d 572, 579 (S.D. 1958).
41. *United States v. Pope & Talbott, Inc.*, 293 F.2d 822 (9th Cir. 1961); *United States v. 15.65 Acres of Land*, 689 F.2d 1329 (9th Cir. 1982), *cert. denied*, 460 U.S. 1041 (1983).

> In [the *Pope & Talbott*] case we noted the existence of three factors that distinguished it from *Campbell*.... (1) the land taken from the condemnee landowner was indispensable to the dam project; (2) the land taken constituted a substantial (not inconsequential) part of the tract devoted to the project; and (3) the damages resulting to the land not taken from the use of the land taken were inseparable from those to the same land flowing from the condemnor government's use of its adjoining land in the dam project. Thus, three elements, indispensability, substantiality, and inseparability, are necessary to negate the application of *Campbell*.
>
> The necessity of these elements is also quite sensible. The element of indispensability assures that the government is being required to pay no more than a private buyer confronted with the same compulsion.... Substantiality tends to assure the existence, in fact, of indispensability, and inseparability tends to assure that the injury to the land not taken does not arise from a use independent of the project with respect to which the property taken was indispensable.[42]

Based on this argument, it appears that the remainder property shown in Figure 14.8 does not have the three elements noted above and would properly fall under the Campbell rule. The area taken was not indispensable to the dam and reservoir project and any damages from the dam and reservoir project would be separable from those caused by the taking and the use to which the government put the land taken.

On the other hand, the property shown in Figure 14.2 might well meet the criteria set down in *Pope & Talbott*. The area taken is obviously indispensable to the project; the project cannot be completed without it. As the test of substantiality is applied to assure indispensability, it would appear that this test has also been met. The third test, inseparability, is also satisfied. Any attempt to separate the damages to the remainder caused by the use to which the property taken was put from the damages caused by the use to which the government put lands taken from others would, from a practical standpoint, be futile.

While strongly advocating application of the Campbell rule, the *Uniform Appraisal Standards for Federal Land Acquisitions* recognizes the conflicting case law on this issue.

> The Ninth Circuit has adopted another rule [in place of the Campbell rule] when the damage may be said to flow from the taking and use of but a portion of the condemnee's property and from the use to which the government puts land taken from a third party neighbor and the damages are inseparable. If confronted with such a situation, it is recommended that you [the appraiser] seek guidance from the agency or Department of Justice attorney.[43]

This is sound advice. If the appraiser has any question whatsoever regarding the compensability of damages that are fully or partially caused by the use to which the government will put land taken from others for the same project, official guidance or legal instructions should be requested. This does not mean, however, that the appraiser must, or even can, accept a legal instruction that is impossible to carry out.

---

42. *United States v. 15.65 Acres of Land*, 1332.

43. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-11, pp. 32-33, fn. 95.

For instance, if legal counsel instructed the appraiser who is appraising the remainder depicted in Figure 14.2 that, as a matter of law, the noise damage resulting from cars using the portion of the highway located in the area taken must be separated from the noise damage resulting from cars using the rest of the highway, the appraiser would undoubtedly have to inform legal counsel that such separation is impossible. The law does not require appraisers to guess. If the condemnor thinks it can find an appraiser who is capable of making the separation and convincing a trier of fact of the logic and reasonableness of the separation, the condemnor is free to retain that individual. However, it is the appraiser's professional reputation that is on the line on the witness stand, not the condemnor's.

In the federal courts, it is for the district judge "to decide 'all issues' other than the precise issue of the amount of compensation to be awarded."[44] Therefore, if it is unclear whether the Campbell rule applies to a specific set of circumstances or the *Pope & Talbott* exception is applicable, the best course of action may well be to obtain a court ruling on this matter prior to trial.

## VALUATION PROCEDURE

Regardless of the methodology used or the specific rules applied, the estimation of compensable damage in the appraisal must be done thoroughly and in logical steps.

The appraiser's first step is to determine the larger parcel or parcels in the before situation. (See Chapter 5 for more discussion on identifying the larger parcel.) It is important that the appraiser's determination of the larger parcel reflect unity of use, unity of ownership, and physical contiguity. The second step is to estimate the highest and best use of the property in the before situation. (Highest and best use is covered in Chapter 6.) In estimating highest and best use, the appraiser must try to overlook the fact that he will later be considering an after situation. The appraiser should adhere to the principle of *reasonable probability* in estimating both highest and best use and the larger parcel. As a third step in the valuation process, the market value of the property being appraised must be estimated in the before situation, utilizing all applicable approaches to value. In most circumstances, all three approaches will have some applicability. If an approach to value is not applicable, the appraiser must explain why.[45] A client's request or instruction that one or more of the standard approaches to value be excluded is not an acceptable reason to exclude an otherwise applicable approach.

The fourth step starts this procedure all over again, but this time the after situation is studied. The appraiser begins by identifying the larger parcel in the after situation. A property may consist of one larger parcel in the before situation and two in the after situation, or vice versa. As stated by one court:

> It is unfortunate that no witness on either side was asked to express an opinion as to the market value of the two remainder tracts if sold separately.... [I]n the ab-

---

44. *United States v. Reynolds*, 397 U.S. 14, 20 (1970); Fed. R. Evid. 71A(h).

45. The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* (USPAP), 1994 ed., Standards Rule 2-2(j), p. 16; *Uniform Appraisal Standards for Federal Land Acquisitions*, §B-1-8, p. 67.

> sence of evidence to the contrary it may be assumed that the highest and best use of a farm cut in two by a condemnation remains the same after the taking as before, and that its highest value is still as a single unit, [but] this case is different.... The case presents a classic instance in which the remainder tracts should have been evaluated separately.[46]

In the fifth step the appraiser estimates the remainder parcel's highest and best use. In making such a determination in the after situation, the appraiser should specifically consider several factors, including the proximity of the new public improvement to the remainder parcel and the possible existence of special or general benefits resulting from the project. (See Chapter 15 for more information on special and general benefits.) The reduced land area and the change in the shape of the remainder parcel are also important considerations, as are changes in access to the remainder property and the nature of the public improvements to be constructed. The appraiser must not only consider changes in the highest and best use of the property between the before and after situations, but also, "in fairness to the condemnee, consideration should be given to any material change in the intensity of use within a highest and best use."[47] The final step in the valuation process is to estimate the value of the remainder property, again using all applicable approaches to value.

In estimating the value of the remainder tract, it is important that the appraiser consider all observations made in determining the highest and best use of the tract in the after situation and the effect, if any, of the proposed public improvement. It is also important to look beyond the immediate boundaries of the remainder property to identify other forces that could affect the property's after value.

Figure 14.9 illustrates the before and after situations of a single-family dwelling affected by the widening of an interstate highway. In the before situation, the property could be accessed via the frontage road and the interstate or the frontage road and County Roads 1 and 2. In the after situation, the depth of the remainder parcel was only nominally reduced and the traveled lanes of the frontage road were no closer to the dwelling than they were before. However, the highway project called for: 1) the closure of the intersection of the interstate and County Road 1; 2) the closure of the intersection of the interstate and County Road 2; and 3) the construction of a new roadway extending County Road 2 to connect with a new interchange on the interstate. The remainder parcel did suffer from some circuity of travel due to the closure of the two intersections, but this item of damage was ruled noncompensable before the trial.

Based on these facts alone, it would appear that the property in question suffered little, if any, diminution in value by reason of the taking and that there was no compensable damage. However, the appraiser for the property owner testified during the trial that, in the preceding 15 years, County Road 1 had flooded an average of 45 days per year at a point two miles from the remainder property and that during future flooding the only access to the remainder property would

---

46. *Commonwealth, Dep't of Highways v. Rowland*, 420 S.W.2d 657, 660 (Ky. 1967).

47. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-3, p. 10.

**FIGURE 14.9 DAMAGE - LOSS OF ADEQUATE ACCESS**




be by rowboat. As there were no plans to alleviate this flooding, the appraiser testified that the subject remainder had suffered extensive damage. After an extended recess of the trial, at the request of the condemning agency, the condemnor stipulated in court that it would expand its project to include elevating County Road 1 to alleviate future flooding.

The difference between the appraiser's estimate of the before value of the property and its after value is the value of the part of the tract taken, as a part of the whole, plus damages to the remainder, if any. Damages reflect the judgment of the appraiser and are based on market analysis, which often requires the use of different comparable sales in the after situation than in the before situation. A damage estimate is not an arbitrary percentage based on the appraiser's "vast years of experience." As L.W. (Pete) Ellwood said:

> I believe experience can teach lessons which may lead to sound judgment. I believe sound judgment is vital in selecting the critical factors for appraisal. But, I also believe the bright 17-year old high school student in elementary astronomy can do a better job estimating the distance to the moon than the old man of the mountains who has looked at the moon for 80 years. So, I find it difficult to accept the notion that dependable valuation of real estate is nothing more than experience and judgment.
>
> I would not give a red cent for an appraisal by the "expert" who beats his breast and shouts; "I don't have to give reasons. I've had 40 years experience in this business. And, this property is worth so much because I say so."
>
> After all, value is expressed as a number. And, no man lives who, through experience, has all numbers so filed in the convolutions of his brain that he can be relied upon to choose the right one without explicable analysis and calculation.[48]

Appraisers must be able to support their conclusions.

> In this connection, unfortunately, appraisers too often use "severance damage" as a catchall. Where their appraisal reports have factual data supporting other conclusions, often so-called severance damages are simply stated as the appraiser's opinion without specification as to the basis for the opinion.[49]

Unsupported damage estimates will be rejected by the courts.[50]

On the other hand, the appraiser must also use common sense. For instance, assume an appraiser is valuing the property depicted in Figure 14.10 in the after situation. After the taking the dwelling is located three feet from the fenced right-

**FIGURE 14.10 PROXIMITY DAMAGE**




48. L. W. Ellwood, *Ellwood Tables for Real Estate Appraising and Financing* (Ridgewood, N.J.: L. W. Ellwood, 1959), preface p. IX.

49. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-11, p. 31.

50. *United States v. 26.07 Acres of Land*, 126 F.Supp. 374 (E.D. N.Y. 1954); *United States v. Honolulu Plantation*, 182 F.2d 172 (9th Cir. 1950), *cert. denied*, 340 U.S. 820 (1950).

of-way and its roof overhangs the taking line. The appraiser cannot conclude that the dwelling suffers no proximity damage simply because no comparable sales of dwellings three feet from an interstate highway right-of-way can be found in the market. The appraiser must exercise sound judgment in such matters, whether or not strong market evidence exists.

Some condemnors' right-of-way procedures seem to encourage appraisers to conclude that a remainder property has suffered no damage. A staff appraiser is given a specific amount of time to complete an assignment or a fee appraiser is given a flat fee for the work. If damages (and/or special benefits) are not found, the sales, income, and cost data used in appraising the property in the before situation may still be applicable in the after situation; however, if damages (and/or special benefits) are found, the appraiser must often collect and analyze a new set of cost, income, and sales data, which is much more time-consuming. Thus the appraiser may be tempted to ignore potential damages. The condemnee's appraiser is often faced with a different dilemma. The condemnee may say, "I don't want you to make an appraisal unless you can come up with damages." The appraiser must guard against all such pressure and be wary of anyone attempting to influence his judgment. (Suggestions for handling these situations are discussed in Chapter 1.)

## CAUSES OF DAMAGE

It is simply impossible to develop an all-inclusive list of the potential damages that could accrue to property in a partial taking case. However, some forms of damage do occur regularly.

In considering damages, appraisers must remember that some state constitutions provide for the payment of compensation only when property is taken; others require payment of compensation when a property is taken or *damaged*. Thus in the former case there must be an actual taking of a property right for compensable damages to occur. In the latter case, compensable damages may result even where no actual taking has occurred, but the damage must be specific to the property in question, not a condition suffered in common with the general public.[51]

If the appraiser is uncertain as to the compensability of an item, a properly supported legal instruction should be obtained. If the compensability of the damage is not clearly established under applicable law, the attorney should inform the appraiser of this fact and instruct the appraiser to prepare two after appraisals—one including the questionable item of damage and one excluding it. Then the appraiser will be prepared to testify on this issue regardless of the court's ruling. Sometimes an attorney can submit information on a questionable item of damage to the court and obtain its determination prior to the condemnation trial.

The appraiser must not presume the existence of damages. "'[S]everance damage' should never be assumed merely because there has been a partial taking."[52] "[D]amages are never presumed, and they will not be allowed if based on specu-

51. *Feltz v. Central Nebraska P.P. & I. Dist.*, 124 F.2d 578 (8th Cir. 1942).

52. *Uniform Appraisal Standards for Federal Land Acquisitions*, §A-11, p. 51.

lation or conjecture."[53] Unless the alleged damage has a demonstrable impact on the market value of the remainder property being appraised, it cannot be considered by the appraiser.[54] Some items of damage are considered too remote and speculative to merit consideration. For this reason in a 1911 case a court disregarded an owner's contention that the construction of a railroad across his land would result in tramps using his barn.[55] In a similar 1907 case a court would not consider the argument of a farmer who contended that his laborers would stop work to watch trains go by.[56]

The existence of damages can most easily be discerned when the highest and best use of the property in the after situation is diminished.[57] There may be a complete change in the highest and best use of the property, or the highest and best use that existed in the before situation may have been modified. Generally the most dramatic change in highest and best use occurs when a property is landlocked or left without legal access in the after situation. Technically such a remainder does not have a highest and best use, but merely helps hold the world together. Its only practical use is sale to an abutting owner.

A property without access may actually lack a market value, in the true sense of the word. The number of potential buyers for such property is often so severely limited that the property cannot, for all practical purposes, be placed on the open market. The number of abutting owners to a landlocked remainder property will often have a bearing on its value because these individuals are often the only potential buyers for the property. Another factor to be considered is the value contribution the remainder property would make if it were merged with the various abutting ownerships.

The value of a landlocked property is typically measured by analyzing similarly situated properties which have been sold recently. State departments of transportation often have information on such sales because their highway projects often create landlocked parcels which they must purchase as uneconomic remnants.[58] The agencies then resell the landlocked parcels as excess rights-of-way.

Some appraisers question whether landlocked sales can technically be considered *comparable sales*. These properties are generally not available on the open market and the sellers are under undue compulsion to sell because potential buyers are few and the seller has no legal access to the property.

It is often difficult, if not impossible, to locate sale properties that are physically similar to a landlocked property. In the absence of physically comparable sales, the appraiser must often make a landlock study to estimate the property's loss in value due to the lack of access. This is essentially an application of the paired data technique of sales analysis applied to landlocked properties. Such a study is illustrated in Figure 14.11. Based on the information provided, it might be concluded that the landlocked parcel (Sale 6) would sell for about $1.75 per square foot if it had legal access. In fact, it sold for $0.29 per square foot, indicating an 83% diminution in value due to its landlocked condition ([$1.75 – $0.29]/$1.75).

53. *State Dep't of Highways v. Gordy*, 322 So.2d 418, 422 (La. 1975).

54. *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913).

55. *Louisville, etc. R Co. v. Hall*, 136 S.W. 905 (Ky. 1911).

56. *Yazoo, etc. R. Co. v. Jennings*, 43 So. 469 (Miss. 1907).

57. *State, Dep't of Highways v. Beatty*, 288 So.2d 900 (La. 1973).

58. Pub. L. 91-646, Title III §301(9).

**FIGURE 14.11 LANDLOCK STUDY**




| Sale | Price | Size | Price/sq. ft. |
|---|---|---|---|
| 1 | $18,000 | 10,000 sq. ft. | $1.80 |
| 2 | $17,500 | 10,000 sq. ft. | $1.75 |
| 3 | $15,000 | 8,500 sq. ft. | $1.76 |
| 4 | $16,000 | 9,000 sq. ft. | $1.78 |
| 5 | $14,500 | 8,500 sq. ft. | $1.71 |
| 6 | $ 2,500 | 8,500 sq. ft. | $0.29 |

A number of landlock studies must be made to develop a pattern of value diminution. These studies may show a pattern in the price paid per square foot, total price paid, or percentage of price paid for landlocked parcels as compared to surrounding properties that are not landlocked. It is important that the lands studied are put to the same type of use as the lands surrounding the landlocked parcel under appraisal. If a tract is surrounded by commercial land, which typically sells on a square foot basis, the contribution that the landlocked parcel will make, as a percentage of value, to an abutting parcel with access will tend to be higher. If the surrounding land is residential, the landlocked parcel may only serve to increase the abutting tract's backyard area.

It is quite possible that the details of the appraiser's landlock studies will not be admissible in court, but such studies are often the only basis for estimating the value of a landlocked remainder. Even if the specifics of the studies are not admissible, the appraiser generally can and should testify that he has made the studies and that his conclusion as to the diminution in value of the property appraised (i.e., its after value) is based on these studies.

A change in the shape of a tract due to a partial acquisition can have a damaging effect on the value of the remainder. The change in shape may make it impossible to develop the site with a building as efficient as the building that existed in the before situation. If the property is farmland, inefficiencies may be created by changing the areas of cultivation or irrigation. Generally the effect of an irregular shape on the market value of a property is measured using comparable sales; the capitalized rent loss can also be used in some instances.

Reducing the size of a tract can result in a substantial reduction in the value of the remainder tract, particularly if the reduction transforms the remainder property into a nonconforming use. A taking could reduce the size of a tract below the minimum area required by applicable regulations, or the remaining amount of frontage, depth, or width could fall below the minimum required. If the property in question is improved, a taking could result in inadequate front, side, or rear yard setbacks. A taking could also leave a building with insufficient off-street parking or create a remainder with too high a ratio of building area to land area. If any of these conditions are produced, the effect of the nonconformity must be determined.

Some land use regulations provide that nonconforming properties are automatically considered conforming if the nonconformity resulted from a partial acquisition by a public agency. If no such provision exists, the appraiser must determine if there is a reasonable probability that a variance from the land use regulation could be obtained. The effect of the nonconformity on property maintenance costs, fire insurance rates, and the owner's ability to finance the property must also be ascertained. Depending on the specific effect of the size reduction, the diminution in value can be measured using comparable sales or capitalization of the rent loss. In some instances the appraiser can use the cost to cure—e.g., when the parking facilities taken can be replaced with site improvements on a portion of the remainder not used for such purposes in the before situation.

When the size of a parcel has been reduced by a taking, it is imperative that the appraiser consider the concept of before and after value. Under the state rule (i.e., value of the part taken as a part of the whole plus damages to the remainder), it may be necessary to allocate the total difference between the before and after values to the value of the part taken and damages to the remainder, but it is much safer to do so only after completing the before and after value estimates. If this is not done, the appraiser may be considering the damage to the property twice and thereby duplicating the compensation. A Kentucky case illustrates this potential problem.

> The second basis for damages given by the two witnesses was that, by reason of lack of depth, a portion of the separated parcel had a reduced value for lot purposes. They computed the damages on the basis of percentages of a desirable lot depth. For example, at one end of the separated parcel, where the depth was only 55', one of the witnesses said that the value had been reduced 75%, so he computed that the original potential lot with a value of $1,000 had been damaged to the extent of $750. The trouble with this is that the landowners had already been allowed compensation in the award for the land *taken*, for the land that would have added the necessary depth to the 55' lot. In other words, if the back 75% of the lot is *taken*, and paid for, the landowner should not recover again, in the form of resulting damages, another 75% of the potential lot value. To do so would allow 150% recovery.

> It may be that if 75% of a lot were taken so as to render valueless, because of its smallness, the remaining 25%, the owner should be paid the full value of the lot. But he cannot be paid the value of the part taken and be awarded that value again as damages to the remainder.[59]

If the appraisers involved in this case had used a computational format like the one described in Chapter 3 of this text, or the form shown in Tables 3.1 and 3.2, this error would not have been made.

The taking or alteration of access rights, including changes in grade, physical access, light, view, and air, can also result in damage to the remainder parcel. Because a change in street grade without a physical taking is not compensable in all jurisdictions, compensability must first be determined. A change in street grade can increase the development costs of a remainder property or eliminate existing driveway or road approaches. In the latter case, the physical and economic practicability of replacing the approaches should be considered. In doing so it may be necessary to investigate the use of a curved driveway and retaining walls, the slope of the approach, and the loss of usable site area for driveway fills or cuts. A change in grade can also alter the physical setback required to construct buildings on a site.

For example, consider the before and after situation of the single-family dwelling shown in Figure 14.12. In the before situation, the site was on grade with the street. After the taking, however, the street will be eight feet higher than the site.

**FIGURE 14.12 CHANGE IN GRADE**




59. *Commonwealth v. Raybourne*, 364 S.W.2d 814, 815 (Ky. 1963).

To establish a new road approach at an acceptable slope, say 12%, the drive must be extended about 67 feet beyond the right-of-way line, which will necessitate removing the garage from its present location. Also, assuming a 2:1 slope of the driveway fill, more than 1,000 square feet of the site must be devoted to fill for the driveway.

The measure of damage in this instance would be the cost to construct the new approach plus either a) the cost to demolish the garage and the diminution in property value due to the lack of garage facilities, or b) the cost of relocating the garage further back on the site to accommodate the new driveway, whichever is less (a or b). Further consideration would, of course, have to be given to the potential value loss due to the greater amount of site area required for fill and driveway purposes and the fact that the site and improvements will be eight feet below street grade. Any loss in value caused by these factors would generally be measured by analyzing comparable sales. If the remainder property were in a market area where a single-family residence without vehicular access would be marketable, the diminution in value caused to the remainder by the lack of vehicular access would have to be compared to the cost to cure items noted above; the lesser amount would be the proper measure of damage.

The severe loss or limitation of access, light, view, and air can alter the highest and best use of a property. Estimating these damages will require the use of different comparable sales in the after situation than in the before situation; thus it can be said that the diminution in value is measured through the analysis of comparable sales.

The term *proximity damage* is defined as "[a]n element of severance [compensable] damages that is caused by the remainder's proximity to the improvement being constructed, e.g., a highway; may also arise from proximity to an objectionable characteristic of a site or improvement, e.g., dirt, dust, noise, vibration."[60] This type of damage is typically measured using comparable sales. Once again, it is often impossible to find recently sold properties that are similar enough to the subject property in the after situation to use for direct comparison. In this case, a *proximity study*, which is similar to the landlock study, should be developed by the appraiser.

The appraiser investigates and analyzes several recently sold comparable properties located near public facilities similar to the proposed public improvement. The appraiser then compares each of these sale properties with other properties that have been sold recently and are comparable except for their proximity to the public improvements. From such a study the appraiser can develop an estimate of the potential damage attributable to proximity of such a public facility.

At times an appraiser may find that there is no price difference between properties near a public facility and similar properties located some distance away. Before the appraiser concludes that no damages are attributable to proximity to the public facility, however, all of the sales utilized in the various proximity studies must be investigated. It may be that the prices paid for the properties reflect no proximity damages, but a much longer time was required to sell these properties.

60. *The Dictionary of Real Estate Appraisal*, 3d ed., 283.

Table 14.2 illustrates a proximity study. If adequate data are available, the appraiser can develop a meaningful statistical analysis of how proximity to a freeway affects the amount of time required to sell similar properties. Assume that the appraiser has studied the data in Table 14.2 and concludes that dwellings close to a freeway can be sold in about 270 days, or nine months. Since the other properties were sold in one to three months, the appraiser should consider the cost of holding the property for an additional six months to be a possible measure of proximity damages. It is highly unlikely that a residential property could be rented while it is actively being marketed so it is unlikely that any income can be generated to offset the holding costs. The appraiser should also consider whether the owner of the property is paying more sales costs (e.g., a higher real estate commission) than the costs paid by owners of property farther from the freeway.

**TABLE 14.2 PROXIMITY STUDY**

| Sale | List Price | Sale Price | Location | Days to Sell |
|---|---|---|---|---|
| 1 | $80,000 | $79,500 | On Freeway | 265 |
| 2 | $82,000 | $82,500 | No Proximity | 64 |
| 3 | $87,500 | $84,000 | No Proximity | 108 |
| 4 | $78,000 | $78,000 | No Proximity | 92 |
| 5 | $67,500 | $67,500 | On Freeway | 272 |
| 6 | $66,000 | $64,000 | No Proximity | 87 |
| 7 | $71,000 | $70,000 | No Proximity | 70 |
| 8 | $65,000 | $65,000 | No Proximity | 91 |
| 9 | $95,000 | $92,500 | On Freeway | 294 |
| 10 | $91,000 | $90,000 | No Proximity | 36 |
| 11 | $92,500 | $92,500 | No Proximity | 102 |
| 12 | $95,000 | $92,500 | No Proximity | 76 |
| 13 | $67,000 | $66,000 | On Freeway | 198 |
| 14 | $60,000 | $60,000 | No Proximity | 94 |
| 15 | $59,500 | $59,000 | No Proximity | 87 |
| 16 | $62,500 | $62,000 | No Proximity | 38 |

It should be noted that all of the property sale prices shown in Table 14.2 are within the same general price range. In any study of marketing time, appraisers must keep in mind that marketing time varies geographically, seasonally, in different price ranges, and in response to the type and amount of financing offered. For these reasons published marketing time studies are notoriously unreliable. They often cover a larger geographical area, include all property sales within a type class (e.g., single-family dwellings), and do not reflect differences in financing. Data on marketing time obtained from a multiple listing service are generally even more skewed. Marketing time is only reported for properties that have been sold; expired listings, which may have been on the market for an extended period, are ignored. Also, once listings have expired, properties are often re-listed

and subsequently sold, but only the duration of the second listing is reported as the marketing time for the property. Sometimes sales fall through and the property is placed back on the market under a new listing. This can skew data as can sales that are reported when an earnest money agreement, or sales contract, is signed rather than when a sale actually closes.

If an appraiser is going to use a study of marketing time to estimate an adjustment or an item of damage, the study should be conducted with the specific subject property in mind. Moreover, the appraiser should collect, or at least verify, all the data personally. If he or she does not, the results of the study may be found to be unreliable and inadmissible as hearsay.

It is not always necessary for the appraiser to reach a conclusion as to why the value of a property is diminished by its proximity to a public facility such as a freeway; in fact it is sometimes advisable to avoid this issue. Elements such as noise that one would normally assume to be present in proximity damages have, on occasion, been ruled noncompensable.[61] It is sometimes best for the appraiser to simply demonstrate with market evidence that single-family properties some distance from the freeway sell for *X* dollars, while comparable properties next to the freeway sell for *Z* dollars less. This procedure has been approved by the courts.

> In making the appraisal, it is not only permissible, but necessary to consider all of the facts and circumstances that a prudent and willing buyer and seller, with knowledge of the facts, would take into account in arriving at market value. The testimony of the defendant's expert which is here under attack indicates that he conformed to that formula. He properly and candidly included the facts that the new freeway adjacent to the property, with the attendant increase in traffic and noises, were among the factors considered in making his appraisal. But there was no attempt to segregate and place a separate money value thereon. We think the trial court was well advised in admitting his testimony and that no prejudicial error was committed.[62]

Often a permanent taking is accompanied by a temporary taking in the form of a construction easement. A temporary construction easement, often referred to as a "TCE," accommodates the construction of the public improvement; it is automatically extinguished at the completion of construction and the unencumbered fee interest in the land reverts back to the owner. The fact that a taking is temporary in nature does not relieve the sovereign from the obligation to pay just compensation. Estimating the diminution in value caused by a temporary taking, which can be quite complex, is discussed in Chapter 16.

## NONCOMPENSABLE DAMAGES

Some damages are, as a matter of law, noncompensable. However, care must be taken in determining compensability because in some jurisdictions an item of

61. *Fairchild v. Oakland etc., R. Co.*, 169 P. 388 (Cal. 1917).

62. *State Road Comm. v. Rohan*, 487 P.2d 857 (Utah 1971).

damage is compensable only if it is accompanied by a partial acquisition. One example of a noncompensable damage item would be the construction of a median barrier in the center of a street. However, it has been ruled that when a median barrier is placed in the street as a part of a public project for which a portion of the property in question was taken, construction of the median barrier may be considered an element of damage.[63]

Damages that are remote and speculative do not merit consideration.[64] Generally damages resulting from the sovereign's police power are noncompensable.[65] Such actions include changes in traffic patterns that increase or decrease traffic;[66] temporary blockage of a street or highway;[67] and deprivation of access, light, view, and air caused by a newly constructed, limited-access highway.[68] Other items of damage that are generally noncompensable include loss of business,[69] tenant relocation,[70] moving of personal property,[71] and frustration of an owner's plans.[72]

An annoyance or inconvenience[73] such as circuity of travel[74] is often ruled noncompensable because the damage is shared with the public in general and is not peculiar to the remainder property. For the same reason, noise, dust, and fumes from highway traffic are sometimes ruled noncompensable.[75] Because recent inverse condemnation avigation easement suits have been successful, however, there is a trend toward recognizing noise as a compensable item of damage in all types of condemnation so long as the noise has a detrimental effect on the property's market value in the after situation.[76] Moreover, when noise levels reach an unreasonable level, they have been ruled compensable, even when no physical taking has occurred.

> The instant case does not involve a physical taking of respondent's property. This fact does not prevent an award for damages under article 1, section 16, of the Washington Constitution (amendment 9). Generally, compensation is not allowed in such circumstance where the injury or damage is one suffered in common with the general public. On the other hand, where the injury or damage is special or peculiar to the particular property involved and not such as is common to all the property in the neighborhood, compensation may be allowed not as a distinct element of damage, but only as it may affect the market value of the property. The measure of damages is the difference between the fair market value before and after the infliction of the damage....
>
> We believe the [freeway] ramp to be constructed in this case may create an echo chamber for 1-way traffic immediately adjacent to the south end of respondent's warehouse and may thereby materially affect the fair market value

63. *State Department of Highways v. Bagwell*, 255 So.2d 852 (La. 1971).
64. *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53 (1913).
65. *State ex rel. Moore v. Bastian*, 546 P.2d 399 (Idaho 1976).
66. *Commonwealth Dep't of Highways v. Yates*, 383 S.W.2d 340 (Ky. 1964).
67. *Commonwealth, Dep't of Highways v. Fister*, 373 S.W.2d 720 (Ky. 1963).
68. *State v. Calkins*, 314 P.2d 449 (Wash. 1957).
69. *Stipe v. United States*, 337 F.2d 818 (10th Cir. 1964).
70. *Springfield, etc., R. Co. v. Schweitzer*, 158 S.W. 1058 (Mo. 1913).
71. *Pause v. Atlanta*, 26 S.E. 489 (Ga. 1895).
72. *United States v. Easement & Rt. of Way, etc.*, 447 F.2d 1317 (6th Cir. 1971).
73. *Wyoming State Highway Dep't. v. Napolitano*, 578 P.2d 1342 (Wyo. 1978).
74. *Houghs v. Mackie*, 137 N.W.2d 289 (Mich. 1965).
75. *Commonwealth, Dep't of Highways v. Cleveland*, 432 S.W.2d 825 (Ky. 1968).
76. *Roman Catholic Bishop of Springfield v. Commonwealth*, 392 N.E.2d 829 (Mass. 1979).

> of respondent's property. This is a special damage differing in kind from the damage sustained by other properties due to the improvement in question. In this situation the jury may consider noise as a factor, if it is a factor, in determining the before and after fair market values of respondent's property. It is not, however, to be singled out separate and apart from all of the other relevant factors in determination of the market values.[77]

## ADVANCED PROBLEMS

### FEAR

A reasonable fear of danger due to the taking and/or proposed construction and operation of public improvements, if the fear is well-founded, has universally been held to be compensable.[78] However, a fear of danger that is unfounded has met with mixed reaction. Some jurisdictions have ruled that unfounded fear is a compensable item because any factor that has a detrimental effect on the market value of the remainder property is a proper consideration.[79] Other jurisdictions have ruled that unfounded fear is not a proper consideration because the damage was not caused by the condemnor's taking, but rather by "the ignorance, prejudice or folly of those who wrongly conceive and believe that it will cause them damage."[80]

Even if fear of danger is a proper element to be considered in estimating the remainder value of a property, it does not necessarily follow that evidence to prove the reasonableness of the fear will be admissible. For instance, a court in Florida recently ruled that the fear of danger was a proper element of damage, but that evidence to support the reasonableness of the fear (in this case, scientific evidence relating to health hazards) was inadmissible because in Florida such damage is recoverable, irrespective of whether the fear is reasonable.[81]

If the property being appraised is located in a jurisdiction that considers fear of danger an element of damage only if it is determined that the fear is well-founded or reasonable, it is not the obligation of the appraiser to make this determination. This task is generally well beyond the appraiser's expertise and far beyond the scope of the appraiser's assignment. The appraiser's job is merely to estimate the market value of the property under appraisal before and after the taking. If the property reflects a diminution in value because of fear of danger, the appraiser should report this fact to legal counsel, who should, in turn, provide the appraiser with a supported legal instruction as to the proper treatment of the damage item.

Such a legal instruction could take one of several forms. For instance, the instruction could advise the appraiser to consider the fear, whether founded or

---

77. *City of Yakima v. Dahlin*, 485 P.2d 628, 630–631 (Wash. 1971).

78. *Texas Electric Service Co. v. West*, 560 S.W.2d 769 (Tex. 1977); *United States v. 760.807 Acres of Land*, 731 F.2d 1443 (9th Cir. 1984).

79. *Collins Pipeline Co. v. New Orleans East, Inc.*, 250 So.2d 29 (La. 1971); *United States ex. rel. T.V.A. v. Easement and Right of Way*, 405 F.2d 305 (6th Cir. 1968).

80. *City of Meriden v. Zwalniski*, 91 A. 439, 441 (Conn. 1914).

81. *Florida Power & Light Co. v. Jennings*, 518 So.2d 895 (Fla. 1987).

not, as a damage element if the property is located in a jurisdiction that does not require fear to be reasonable or well-founded. If the jurisdiction requires such fear to be well-founded before it can be considered, the legal instruction could advise the appraiser to conduct a double-premise appraisal in the after situation—one reflecting the diminution in value caused by fear and the other excluding consideration of such damage. As an alternative, the legal instruction could advise the appraiser to assume that the fear was reasonable (or unreasonable) and conduct the appraisal accordingly. However, this latter instruction would have to contain legal and/or scientific support to be accepted by the appraiser.

Much research has recently been conducted concerning the effect on human health of the electromagnetic fields (EMFs) created by electrical transmission lines.[82] There appears to be significant evidence that EMFs may affect human health, but the issue is contested and research is continuing. Market data, however, often reveal that the results of this research are not, at least not yet, affecting the price of property near transmission lines.[83] This may be due to a lack of knowledge on the part of purchasers, a lack of belief in the research results, or a combination of the two.

The appraiser need not decide whether EMFs have an impact on human health or whether EMFs *should* have an effect on real estate values. The appraiser need only determine whether EMFs do, in fact, have an impact on real estate values. The "typical purchasers" referred to in the definition of market value are supposed to be reasonably knowledgeable, but they are not expected to be experts in the field of human health. As additional studies are conducted on the effects of EMFs and the results of these studies become more widely known, it is quite possible that a *measurable effect* on the value of real estate near electrical transmission lines will be identified. For this reason appraisers should not rely on outdated market studies. However, until it can be demonstrated that the proximity of a property to an electrical transmission line has a detrimental effect on its value, appraisers cannot reflect such a diminution in their value estimates.

Some local government agencies have recently begun to adopt land use regulations that require minimum building setback requirements from electrical transmission lines. These regulations have undoubtedly been prompted by the results of some of the health studies conducted. If the property being appraised is subject to such a setback requirement, the appraiser must consider this land use regulation in both the highest and best use estimate and in the estimate of property value. The jurisdictional rules regarding compensability for fear of danger are of no consequence in such circumstances.

## ACCESS, CIRCUITY OF TRAVEL, AND DIVERSION OF TRAFFIC

As noted in Chapter 4, a property owner has the right to suitable access and compensation is due if this right is taken. But, as noted earlier in this chapter, an owner is not due compensation for circuity of travel or diversion of traffic. These

82. See Hsiang-te Kung and Charles F. Seagle, "Impact of Power Transmission Lines on Property Values: A Case Study," *The Appraisal Journal* (July 1992), 413–418.

83. Ibid.

seem to be fairly clear rules of law, until the appraiser attempts to apply them in the marketplace and the courts attempt to apply them to factual situations. As one court indicated,

> We do not deal here in absolutes. Circuity of access may be rendered extreme to the point of counting as a substantial impairment of access…, each case consists of assessing a variety of factors, including most notably the existence, availability and feasibility of routes, all in connection with the uses to which the property has been (or may be) put, to determine whether the claimant or his patrons, previously in a reasonable relation to a road system reaching the property, have now been left without such a relation.[84]

One of the problems with applying these rules is that the definition of *suitable access* varies with the current (or highest and best) use of the property in question. What constitutes suitable access for a single-family dwelling may be unsuitable access for commercial purposes. Another problem is that these rules often have harsh results and can lead to an exception to the *before and after rule* wherein all damages are considered.

The harshness of these rules can be illustrated by referring back to Figure 14.8. In this case, property was taken for mitigation of the wetlands destroyed for a dam and reservoir project. The portion of the parcel not taken (the remainder property) was improved with a commercial facility, highly dependent on patronage from those traveling the state highway abutting the property. In the before situation the traffic count on the highway was approximately 10,000 cars per day. Because the new reservoir flooded a portion of the state highway, however, a new highway route was constructed to the east which diverted most of the traffic away from the remainder property. The old highway was closed at a point north of the remainder property. In the after situation the remainder property reverted to a highest and best use for agricultural and residential purposes, reducing its before value by more than 70%.

This diminution in value was not compensable. Access (ingress and egress) to the remainder property had not changed and circuity of travel was minimal. The entire diminution in value resulted from the diversion of the state highway traffic from the old right-of-way to the new highway route. As diversion of traffic is a noncompensable damage, there was no compensation for damages due to the owner of the remainder.

If the government had abandoned the highway right-of-way in front of the remainder property, the owner of the remainder would have been due compensation because the remainder property's access to a public road system would have been unsuitable. Also, in some jurisdictions the owner would have been due compensation if the remainder property had abutted the highway at the point of closure, i.e., if the highway had been closed at the northeast corner of the remainder property.

Often a public project will have a direct impact on the access to a property and, at the same time, will result in some circuity of travel and diversion of traffic.

84. *Malone v. Commonwealth*, 389 N.E.2d 975, 979 (Mass. 1979).

It is nearly impossible to segregate the damages to the remainder property due to these individual elements. The rules of compensation for the damages resulting from these combined elements will vary from jurisdiction to jurisdiction and from situation to situation. Often, a court's decision on compensability will hinge on the words the appraiser uses on the witness stand to describe and explain the estimate of damage to the remainder property.

When an appraiser encounters a remainder property that has been affected by a change in access, circuity of travel, and/or diversion of traffic, the best course of action is to request advice on compensability (and supported legal instruction, if necessary) from legal counsel. The worst course of action would be for the appraiser to attempt to classify a damage clearly caused by a diversion of traffic as a damage caused by a change of access. Appraisers do not have the option of bending the rules of compensability to fit their own views of fairness. Appraisers are not in the business of determining what is fair; they are in the business of estimating market value *in accordance with the rules set down by the courts.*

## SUMMARY

In condemnation, damage is the loss in the value of a remainder property in a partial taking case brought about by the taking and/or the construction and operation of a proposed public improvement. The appraiser is advised to avoid the terms *consequential damages* and *severance damages* because of the confusion surrounding their precise definitions. In conjunction with the sovereign's right of eminent domain and the act of condemnation, the appraiser need only segregate damages into two categories—compensable damages and noncompensable damages.

A property owner is not compensated for what the sovereign plans to do with the land acquired but, rather, for all damage the condemnor will have the right to inflict on the remainder property. The appraiser must therefore fully understand not only what the condemnor proposes to do with the land taken, but also all of the things it is acquiring the right to do.

Damages are estimated to better estimate the market value of the property being appraised in the after situation. Damages are not individual items of consideration and an owner is not entitled to compensation for each type of damage on an individual basis. Three measures of damage are commonly used: 1) analysis of comparable sales, 2) cost to cure, and 3) capitalized rent loss.

To ensure that all elements that affect property value are considered, the appraiser must perform the appraisal assignment in a logical progression. The steps to be followed by the appraiser in valuing property in a partial taking are:

- Identify the value of larger parcel before acquisition.
- Determine highest and best use before acquisition.
- Estimate market value before acquisition.
- Identify the larger parcel after acquisition.

- Determine highest and best use after acquisition.
- Estimate market value after acquisition.

The damages to a remainder parcel that can result from a partial taking are so varied that an all-inclusive list cannot be prepared. Damages are definitely indicated when the highest and best use of the property in the after situation has been diminished from the highest and best use in the before situation. Not all damages to a remainder property are compensable; remote and speculative damages are universally held to be noncompensable. Many damages have been ruled noncompensable when they are not accompanied by a taking, but are considered compensable when accompanied by a taking. Therefore, the appraiser should not make blanket assumptions regarding the compensability or noncompensability of a particular damage item. Legal counsel should be asked to determine the compensability of any damage item in question.

The major *do's* and *don'ts* of estimating damages are listed below.

*Do*:

- Follow logical steps in estimating the before and after values of property.
- Consider all the rights being acquired by the condemnor.
- Develop market support for all estimates of damage.
- Use damage estimates to better estimate the market value of the remainder property.
- Use the format shown in Table 3.1 to summarize value conclusions.
- Follow the rules of compensability established by the courts.
- Get supported legal instructions for any damage item of questionable compensability.
- Use common sense.

*Don't*:

- Assume damages.
- Go on a crusade to find damages.
- Use confusing terminology, e.g., consequential damages, severance damages.
- Consider damage estimates as separate elements of damage to be added together.
- Use the cost to cure measure of damage if the cost to cure exceeds the diminution in market value that would result if the cure were not undertaken.
- Try to disguise noncompensable damages as something else.
- Try to separate elements of damage that are inseparable.